ALDRIDGE & STROUD, INC. *v.* AMERICAN-CANADIAN OIL & DRILLING CORP.

5-2529                                           357 S. W. 2d 8

Opinion delivered May 7, 1962.

[Rehearing denied June 4, 1962]

*Mehaffy, Smith & Williams* and *D. D. Panich; Keith, Clegg & Eckert* and *Wright, Lindsey, Jennings, Lester & Shults,* for appellant.

*Francis B. Borden, Jr., J. Hugh Wharton, J. S. Thomas, Joe B. Hurley,* and *Joel B. Dickinson,* Dallas, Tex., for appellee.

Ed. F. McFaddin, Associate Justice. This case was pending in the Second Division of the Union Chancery Court, in one form or another, from 1956 until 1960, and involved a number of parties and issues. Finally, the Chancellor was able to get all parties present for a hearing, and he disposed of the issues in a finding that listed the various controversies between the litigants. All of these controversies have become final except the four involved on this appeal. Yet it is necessary to give a rather lengthy recital of the background facts to present the four controversies now before us.

Mrs. Ruth Corder Roberts owned an undivided working interest in certain oil wells in the Smackover field in Union County. R. M. Crabtree and others also owned undivided working interests, along with Mrs. Ruth Corder Roberts; and in 1953 the owners of the working interests executed a lengthy contract, whereby R. M. Crabtree and others were designated as ''operator'' of all the working interests and clothed with certain powers and duties. Among other provisions in the contract was Section 22, designated ''Preferential Purchase Rights,'' to be later discussed.

On April 16, 1956, R. M. Crabtree filed suit No. 12904 in the Second Division of the Union Chancery Court against the American-Canadian Oil & Drilling Corporation, Ruth Corder Roberts, and various other parties on the said 1953 contract. Crabtree sought judgment against the various defendants for various stated amounts, and prayed that their working interests be sold to satisfy the said respective judgments. Monsanto Chemical Company and MacMillan Petroleum Corporation were purchasing the oil runs from the property, and they were also made defendants so that the oil runs might be held subject to the orders of the Court.

The American-Canadian Oil & Drilling Corporation (hereinafter called ''American-Canadian'') had purchased the interest of Ruth Corder Roberts in the prop-

erty in 1955; and that is the reason why American-Canadian was made a defendant. Various pleadings were filed, and on July 11, 1957, Aldridge & Stroud, Inc. (hereinafter called "Aldridge & Stroud") intervened, claiming that Aldridge & Stroud held a note executed by American-Canadian for $75,000.00 and interest, and a mortgage on all of American-Canadian's oil runs from the Ruth Corder Roberts Smackover properties.

On October 28, 1957 Crabtree's original claim against the owners of the working interests was satisfied and dismissed by reason of what is called the "Anthony Deal," hereinafter to be discussed. But the case No. 12904 was still left pending because of the Aldridge & Stroud intervention. Then, on June 19, 1958, Crabtree intervened in the same suit, this time seeking relief against Ruth Corder Roberts and American-Canadian because of the "Anthony Deal." Kay Van and William T. Foran intervened, and various other parties intervened; and what was commenced as a suit by Crabtree for money he had advanced in the operation of the wells became almost a "free-for-all" receivership of the working interest that was originally owned by Ruth Corder Roberts, and which she had conveyed to American-Canadian.

As aforesaid, the Chancellor was finally able to get all the litigants and intervenors together to present the issues; and on December 22, 1960 there was entered the decree from which comes this appeal. There were a number of litigants and issues, but we have only four of those before us on this appeal; and we will now proceed to consider those four issues.

I. *R. M. Crabtree's Intervention.* On June 19, 1958, Crabtree intervened, claiming that he was entitled to purchase the Ruth Corder Roberts interest for some amount of money which counsel now estimate as $270,-000.00. The Crabtree intervention alleged; that under

Section 22 of the operating instrument of 1953,[1] Crabtree was given the preferential right to purchase the Ruth Corder Roberts interest if she ever sold; that she gave him notice that she was selling to American-Canadian for $400,000.00 cash and 150,000 shares of American-Canadian stock; that said notice was false, in that she sold on different terms; and that Crabtree could still exercise his preferential purchase right for the actual value of the property.

---

[1] Said Section 22 reads as follows:

"22. *PREFERENTIAL PURCHASE RIGHTS.* If any party hereto should desire to sell all or any part of his interest in the jointly owned leases and materials, the other parties shall have the preferential right to purchase the same as herein provided, except that such right shall not apply to a sale by any corporation which is a part hereto to a successor to all or substantially all of its business and assets or to a corporation which is a parent or subsidiary of the selling corporation, or affiliated with the selling corporation through common ownership of voting stock, or to a sale by any individual party hereto to a private closed corporation organized by such individual party and of which he is the principal stockholder, or to a sale by any individual party to any member of his immediate family or any trust created by such individual party for the benefit of any person in the immediate family of such individual. Subject to the foregoing exception, a party hereto shall not make any sale of all or any part of his interest in the jointly owned leases and materials otherwise than pursuant to a *bona fide* written offer from a purchaser who is ready, willing and able to purchase the same, accurately describing the interest to be purchased and providing for a purchase price payable in lawful money of the United States. If any party should receive and desire to accept any such offer, such party shall give written notice thereof to each of the other parties, together with a true copy of such offer, and the other parties shall have the option, exercisable only by written notice given to the selling party within ten (10) days after the giving of notice of desire to sell, to purchase the interest described in the offer for the purchase price therein stated. If each option should be so exercised by the other parties, or any of them, the buying party or parties shall be allowed a reasonable time, not exceeding thirty (30) days, for examination of the title to the interest being purchased, the obligation of the buying party or parties to purchase such interest being conditioned upon title thereto being found to be merchantable in the selling party. Promptly upon approval of title, the purchase price shall be paid by the buying party or parties, and the selling party shall execute and deliver to the buying party or parties a properly executed instrument of conveyance of the interest being sold, with full warranty of the title thereto; if the conveyance is made to two or more parties, the interest conveyed to each shall be in the proportion that his interest in the jointly owned leases bears to the combined interests of all the buying parties therein. If the option above provided for is not exercised by any party here to within the ten-day period allowed therefor, the party desiring to sell shall be free to accept the offer, copy of which was submitted to the other parties, and to sell the interest therein described in accordance with the terms of such offer, but not otherwise."

Should Crabtree prevail he would acquire all of the interest of American-Canadian in the Smackover property, so this is the first matter for determination. On the Crabtree claim the Chancellor, in his opinion, said:

"Although R. M. Crabtree was the moving party herein in the beginning of this action, and later as an Intervenor, and although he had the right to purchase the interest for which he has intervened herein, the Court finds, from the time of the letter to him advising that a sale was imminent, he made no effort to avail himself of this right, and that he cannot, at this late date, prevail in purchasing the property involved, and his cause of action, together with his Intervention, should be dismissed for want of Equity."

We agree with the Chancellor's findings on the Crabtree claim. The operating instrument of 1953 was never placed of record so could not be binding on any persons except those with actual notice. The dealings between Mrs. Ruth Corder Roberts and American-Canadian began in 1955, when she agreed to sell all of her working interest in the Smackover property to American-Canadian for $400,000.00 in cash and 150,000 shares of stock. American-Canadian experienced difficulty in acquiring the $400,000.00 in cash, and persuaded Mrs. Ruth Corder Roberts (whose husband had died in the meantime) to accept more stock and less cash. In the course of the negotiations, American-Canadian learned of the said Section 22 of the 1953 contract which gave Crabtree preferential rights to purchase Mrs. Ruth Corder Roberts' interest; and a letter was written by Mrs. Ruth Corder Roberts to Crabtree on September 19, 1955, wherein she advised Crabtree of her February agreement to sell the property to American-Canadian for $400,000.00 cash and 150,000 shares of stock.

Crabtree wrote Mrs. Ruth Corder Roberts on September 30, 1955, acknowledging receipt of the letter, waiving all formalities or irregularities in the notice, and said: ". . . I have elected to exercise the option

in that Agreement to purchase your interests in these properties." But after Crabtree notified Mrs. Ruth Corder Roberts of his election to purchase her interest, he had a geologist go over the property, and then concluded from the geologist's report that the interest of Mrs. Ruth Corder Roberts was not worth the amount for which she was selling it. So far as the record before us discloses, Crabtree never notified Mrs. Ruth Corder Roberts that he had changed his mind and would not take the properties. Instead, he remained silent. Under the terms of said Section 22 he was allowed only thirty days in which to complete the transaction after exercising his option. He did nothing further until he filed his intervention herein on June 19, 1958, which was over two years later.

As heretofore stated, American-Canadian was experiencing difficulties in acquiring the $400,000.00 cash to finance the purchase of the property from Mrs. Ruth Corder Roberts, and finally this transaction (herein called the "Anthony Deal") was accomplished: Mrs. Ruth Corder Roberts mortgaged her interest in the Smackover property to Anthony for $150,000.00 and received the cash; American-Canadian paid her $5,000.00, in cash and she received 395,000 shares of stock in American-Canadian of the par value of $1.00 per share. If the stock in American-Canadian was worth par, Mrs. Roberts received the equivalent of $400,000.00 in cash and $150,000.00 in stock; but the consummated transaction was different from the one originally planned. Crabtree says he did not learn of the variation in the transaction between Ruth Corder Roberts and American-Canadian[2] until shortly after June 1, 1956. But, even so, on October 28, 1957, in this case No. 12904, he dismissed his original claim on the 1953 operating contract against American-Canadian and Ruth Corder Roberts; and then delayed until June 19, 1958 before intervening and seeking to pursue his alleged preferential rights against American-Canadian and Ruth Corder Roberts. Without going into the issue of *res judicata,*

---

[2] This date appears in his "Petition" filed in the Chancery Court.

we affirm the Chancellor's decision against Crabtree because of the equitable maxim: "Equity aids the vigilant, and not those who sleep upon their rights." Courts of equity do not sit to restore lost opportunity, or to renew possibilities that have been permitted to pass by neglect.[3] After he learned the facts Crabtree delayed more than two years before intervening and asserting rights against American-Canadian. In the interim, the situation had changed. Values change rapidly in oil and gas matters (see *Sanders* v. *Flenniken*, 180 Ark. 303, 21 S. W. 2d 847); and Crabtree's unconscionable delay is sufficient, in itself, to justify a court of equity in refusing to allow him to now receive the properties after it has been shown that his geologist's report was wrong and that the properties have produced far more oil than was thought probable in 1956.

II. *The Aldridge & Stroud Intervention.* Aldridge & Stroud intervened in the proceedings on July 11, 1957, seeking judgment on a note for $75,000.00, executed by American-Canadian, dated April 4, 1956, and secured by a mortgage on the oil runs from the property.[4] The witnesses for Aldridge & Stroud testified that the Company had drilled a well for T. E. Robertson Company, Inc. in Hudspeth County, Texas, which well was necessary to be drilled in order to validate certain leases; that the leases were all transferred to American-Canadian; that the balance due for drilling the well was $75,000.00, which American-Canadian agreed to pay since it had acquired the leases; and that the mortgage or assignment was security for the $75,-000.00 note. T. E. Robertson, President of American-Canadian when the note and mortgage were executed, testified that the note and assignment were legal and valid in every respect.

---

[3] See 19 Am. Jur. p. 333 "Equity" § 333.

[4] As regards the Aldridge & Stroud claim, the Chancellor said: "The Court is of the opinion that there is no merit in the Intervention of Aldridge & Stroud, Inc. and that the alleged 'assignment' to it is without consideration and same should be cancelled so as not to be a cloud on the title to this leasehold."

There are a number of suspicious circumstances regarding this Aldridge & Stroud claim; but we have a note and assignment, fair on their face, and the President of American-Canadian testifying that he executed the note and mortgage for the Company and that the same were valid. Without reciting all of the testimony, we have reached the conclusion that the resisting evidence is insufficient to show that the note and assignment were fictitious, or that they have been satisfied. We, therefore, reverse that portion of the Chancery decree which disallowed the claim of Aldridge & Stroud, and direct that the same be allowed; but it must be allowed junior to the Foran claim and the Kay Van claim subsequently to be discussed. In other words, the Foran claim and the Kay Van claim must be paid in full before the Aldridge & Stroud claim is paid.

III. *The William T. Foran Claim.* Regarding this claim there seems to be very little controversy. Foran loaned $12,000.00 to American-Canadian; and as security he received an assignment of the oil runs; his assignment was duly placed of record; and due proof of his claim was made. We affirm the allowance of the claim. As regards the Foran claim, the Chancellor's opinion states:

"The Court finds that the claim of W. T. Foran is also a valid and bona-fide claim in the amount of $12,000.00 and that he should have Judgment for that amount, together with interest from date until paid at the rate of six per centum (6%) per annum. That said amount is a lien against the property involved herein, . . ."

IV. *Mrs. Kay Van's Claim.* As a part of her sale to American-Canadian, Mrs. Ruth Corder Roberts executed a mortgage on the property to Anthony for $150,000.00. This has heretofore been referred to as "the Anthony Deal." Default was made on this mortgage and Anthony filed foreclosure in the First Division of the Union Chancery Court. In order to prevent the foreclosure, American-Canadian persuaded Mrs. Kay

Van to loan American-Canadian $72,000.00, which, with impounded oil runs, would be sufficient to pay the Anthony mortgage. In the meantime, American-Canadian had been placed in receivership in the State of New York and Mrs. Kay Van issued and delivered her $72,000.00 check to Evans, the New York Receiver. The funds were used to satisfy the Anthony foreclosure, which was dismissed. It was represented to Mrs. Kay Van by the attorney for American-Canadian that if she paid this money, she would be subrogated to the Anthony mortgage and would receive her money with interest. The fact that she paid the money is conclusively established by the original check in the record. But it is insisted that the New York Receiver received some amount and should have paid Mrs. Kay Van out of such proceeds. A study of the record shows that Mrs. Kay Van did not look to the New York Receiver for the money: she was told that she would be subrogated to the Anthony mortgage and would receive her money from the oil runs. She followed the procedure suggested by the attorney for American-Canadian. She has received part of her money, and she now seeks the balance. As regards her claim, the Chancellor said:

"The Court finds that Mrs. Kay Van's claim for Judgment is a valid and bona-fide claim, and that there is due her the amount of $54,798.16, together with interest from this date at the rate of six (6%) per centum per annum until paid. The Court does not feel that this Judgment is a lien on the money held in the Registry of this Court, but should, rather, be a lien on the property involved herein as of and from this date."

Mrs. Kay Van has not cross-complained from this latter finding; so the decree of the Chancery Court is affirmed as regards the claim of Mrs. Kay Van.

V. *Conclusion.* The Chancery decree is affirmed in all respects except as to the Aldridge & Stroud claim. As to it, the decree is reversed and the cause remanded

with directions to allow the Aldridge & Stroud claim, but junior to the Foran claim and the Van claim, as hereinbefore stated. All costs are taxed against the oil properties.

WARD, J., not participating.