## Chris Titchenal v. Diane Dexter

[693 A.2d 682]

No. 96-188

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed February 28, 1997

Motion for Reargument Denied April 23, 1997

*Julie A. Frame* and *Jennifer E. Nelson* of *Hoff Curtis Pacht Cassidy & Frame, P.C.*, Burlington, for Plaintiff-Appellant.

*John R. Durrance, Jr.* of *Gaston, Durrance & Fairbanks*, Montpelier, for Defendant-Appellee.

*Mary L. Bonauto*, Boston, Massachusetts, for Amicus Curiae Gay & Lesbian Advocates & Defenders.

**Allen, C.J.** The issue in this case is whether the superior court may apply its equitable powers to adjudicate a visitation dispute that cannot be brought in statutory proceedings within the family court's jurisdiction. We affirm the superior court's decision that it does not possess the authority to adjudicate such matters.

The dispute arose after the breakup of a relationship between two women who had both participated in raising a child adopted by only one of them. Plaintiff alleges the following facts, which are disputed but accepted as true for purposes of reviewing the trial court's dismissal of the case. See *Sabia v. State*, 164 Vt. 293, 297, 669 A.2d 1187, 1190 (1995). In 1985, plaintiff Chris Titchenal and defendant Diane Dexter began an intimate relationship. They purchased a home together, held joint bank accounts, and jointly owned their automobiles. They both contributed financially to their household, and each regarded the other as a life partner.

At some point, the parties decided to have a child. When their attempts to conceive via a sperm donor failed, they decided to adopt a child. In July 1991, defendant adopted a newborn baby girl, who was named Sarah Ruth Dexter-Titchenal. The parties held themselves out to Sarah and all others as her parents. The child called one parent "Mama Chris" and the other parent "Mama Di." For the first three and one-half years of Sarah's life, until the parties' separation, plaintiff cared for the child approximately 65% of the time. Plaintiff did not seek to adopt Sarah because the parties believed that the then-current adoption statute would not allow both of them to do so.

Eventually, the parties' relationship faltered, and by November 1994 defendant had moved out of the couple's home, taking Sarah with her. For the first five months following the parties' separation, Sarah stayed with plaintiff between Wednesday afternoons and Friday evenings. By the spring of 1995, however, defendant had severely curtailed plaintiff's contact with Sarah and had refused plaintiff's offer of financial assistance.

In October 1995, plaintiff filed a complaint requesting that the superior court exercise its equitable jurisdiction to establish and enforce regular, unsupervised parent-child contact between her and Sarah. The court granted defendant's motion to dismiss, refusing to recognize a cause of action for parent-child contact absent a common-law or statutory basis for the claim. On appeal, plaintiff argues that the superior court has equitable jurisdiction under the state's parens patriae authority to consider her complaint, and that both public policy and the doctrines of in loco parentis and de facto parenthood allow the court to exercise its equitable authority in cases such as this. An organization called the Gay & Lesbian Advocates & Defenders (GLAD) makes essentially the same arguments in its amicus curiae brief.

■ Plaintiff urges us to grant "nontraditional" family members access to the courts by recognizing the legal rights of de facto parents.[1] According to plaintiff, the state's parens patriae power to protect the best interests of children permits the superior court to adjudicate disputes over parent-child contact[2] outside the context of a statutory proceeding. Thus, under the scheme advocated by plaintiff and amicus curiae, the family court would adjudicate disputes concerning parental rights and responsibilities and parent-child contact within the parameters and criteria set forth in statutory divorce, parentage, dependency and neglect, nonsupport and separation, relief-from-abuse, and at times guardianship and adoption proceedings, see 4 V.S.A. §§ 454-455 (establishing jurisdiction of family court), while the superior court would exert its equitable

---

[1] Some courts and commentators have distinguished between "de facto" parents and persons standing "in loco parentis" to a child. E.g., N. Polikoff, *This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian-Mother and Other Nontraditional Families*, 78 Geo. L.J. 459, 510 (1990) (major distinction between de facto parent doctrine and doctrine of in loco parentis is that latter customarily entails both financial and emotional support, while former focuses solely on psychological bond between adult and child); see *In re Fowler*, 130 Vt. 176, 179, 288 A.2d 463, 465 (1972) (term "in loco parentis" means in place of parent as to rights, duties, and responsibilities). For purposes of this opinion, we see no need to draw fine lines between the doctrines. Plaintiff's point is that though she is not the legal parent of Sarah, in all other respects she has acted as the child's parent.

[2] Regardless of whether we view parent-child contact (visitation) as a limited form of parental rights and responsibilities (custody) or as a limitation upon another's parental rights and responsibilities, such rights may be granted only in a jurisdictionally sound custody proceeding. *Finck v. O'Toole*, 880 P.2d 624, 626 (Ariz. 1994); see *Loeb v. Loeb*, 120 Vt. 489, 492, 144 A.2d 825, 827-28 (1958) (visitation directly concerns custody); *Cooper v. Merkel*, 470 N.W.2d 253, 255 (S.D. 1991) (right of visitation derives from right of custody and is controlled by same legal principles).

powers to consider such disputes arising outside these statutory proceedings.

■ We find no legal basis for plaintiff's proposal. Courts cannot exert equitable powers unless they first have jurisdiction over the subject matter and parties. *In re Marriage of Ryall*, 201 Cal. Rptr. 504, 512 (Ct. App. 1984); see *Perry v. Superior Court of Kern County*, 166 Cal. Rptr. 583, 584 (Ct. App. 1980) (visitation rights may be awarded to nonparents only in proceeding in which court otherwise has jurisdiction over issue of custody). Equity generally has no jurisdiction over imperfect rights arising from moral rather than legal obligations; not every perceived injustice is actionable in equity — only those violating a recognized legal right. *In re E.C.*, 387 N.W.2d 72, 77 (Wis. 1986). A court of equity does not create rights, but rather determines whether legal rights exist and, if so, whether it is proper and just to enforce those rights. *City of St. Louis v. Golden Gate Corp.*, 421 S.W.2d 4, 7 (Mo. 1967); see *Juaire v. Juaire*, 128 Vt. 149, 152, 259 A.2d 786, 788 (1969) (equity affords relief whenever legal right exists without adequate remedy; by bringing action in equity, plaintiff did not seek to acquire new right, but rather sought new remedy for preexisting right). In short, a court may exert its equitable powers to grant appropriate relief only when a judicially cognizable right exists, and no adequate legal remedy is available. See *Chapman v. Sheridan-Wyoming Coal Co.*, 338 U.S. 621, 630-31 (1950) (courts applying their equitable powers "can intervene only where legal rights are invaded or the law violated").

■ The issue, then, is whether there is any underlying legal basis for plaintiff's cause of action that would allow the superior court to apply its equitable powers to adjudicate her claim. Courts may exert equitable powers based upon common-law, statutory, or constitutional rights, or upon judicial acknowledgement of public-policy consider-ations establishing an as-yet-unrecognized legal right. See *Payne v. Rozendaal*, 147 Vt. 488, 492-94, 520 A.2d 586, 588-89 (1986) (notwith-standing absence of statutory directive regarding age discrimination at time of alleged wrong, claim of age discrimination was sufficient basis for wrongful discharge action because termination of employee solely on basis of age is so contrary to society's concern for providing equity and justice that there is clear and compelling public policy against it).

■ Here, we find no legal basis from any of the above sources for plaintiff's claimed right to parent-child contact in her capacity as an

equitable or de facto parent. Notwithstanding plaintiff's claims to the contrary, there is no common-law history of Vermont courts interfering with the rights and responsibilities of fit parents absent statutory authority to do so. Although there is some support for the proposition that state courts have equity jurisdiction under their parens patriae power to adjudicate custody matters, such authority is generally invoked in the context of dependency or neglect petitions. See *Insurance Co. v. Bangs*, 103 U.S. 435, 438 (1880) (equity jurisdiction for protection of children began in English courts of chancery and originated from general duty of crown as parens patriae to protect persons *who have no other rightful protector*). Invoking equity jurisdiction under these circumstances was a narrow exception to the general common-law rule that parents had the right to the custody, control, and services of their minor children free from governmental interference. *Bioni v. Haselton*, 99 Vt. 453, 457, 134 A. 606, 607 (1926); see *In re S.B.L.*, 150 Vt. 294, 303, 553 A.2d 1078, 1084 (1988) (parents and children have liberty interest in relating to each other free from governmental interference); *Olds v. Olds*, 356 N.W.2d 571, 574 (Iowa 1984) (common-law rule prohibiting third-party visitation over parental objection represents recognition that parents' fundamental right to control over their children is protected against unwarranted state intrusion); *In re Hruby*, 748 P.2d 57, 60 (Or. 1987) (father's ancient common-law right to his children was qualified by eighteenth and early nineteenth century decisions in which equity courts exercised their parens patriae power to look after minors unable to care for themselves); 2 H. Clark, The Law of Domestic Relations in the United States § 20.7, at 539 (2d ed. 1987) (common law did not authorize courts to grant visitation to persons other than parents); cf. *Town of Brighton v. Town of Charleston*, 114 Vt. 316, 321, 44 A.2d 628, 632 (1945) (state is authorized as parens patriae to *legislate* for protection, care, custody, and maintenance of children within its jurisdiction).

With one possible minor exception,[3] the custody-related cases cited by plaintiff and amicus curiae involve decisions made within the

---

[3] The only case cited by plaintiff or amicus curiae that even indirectly involves a custody determination outside the context of an expressed statutory provision is an 1877 case in which this Court upheld a judgment that the defendant father, who had taken his illegitimate son to an orphanage after settling his liability with the town that had been supporting the boy, was not guilty of trespass and false imprisonment because he had a right to custody and control of the child by virtue of the authority derived from the town. *Adams v. Adams*, 50 Vt. 158, 161 (1877). This case hardly establishes equity jurisdiction over custody matters outside statutory proceedings, and even if it did, it would do so only for cases involving dependency or neglect.

context of statutory proceedings. See *In re B.L.V.B.*, 160 Vt. 368, 371-73, 628 A.2d 1271, 1273-74 (1993) (construing provisions of adoption statute); *Bissonette v. Gambrel*, 152 Vt. 67, 69, 564 A.2d 600, 601 (1989) (action brought under statutory parentage proceeding); *S.B.L.*, 150 Vt. at 306, 311, 553 A.2d at 1086, 1089 (construing guardianship and grandparent visitation statutes); *Paquette v. Paquette*, 146 Vt. 83, 85, 499 A.2d 23, 25 (1985) (construing divorce and separation statutes); *Bioni*, 99 Vt. at 456, 134 A. at 607 (petition brought under statutory guardianship proceeding). From early on, Vermont courts intervened in custody matters concerning fit parents only under the authority of divorce statutes originating from the eighteenth century, and later nonsupport and separation statutes. See *Ward v. Ward*, 70 Vt. 430, 431, 41 A. 435, 435 (1898) (petition for custody under separation statute); *Buckminster v. Buckminster*, 38 Vt. 248, 249-50 (1865) (construing divorce statutes).

In 1984, the Legislature enacted both a parentage act that gave putative fathers the right to bring an action to establish paternity (and thus seek custody or visitation), 15 V.S.A. §§ 301-306, and an act allowing grandparents to request visitation under limited circumstances, 15 V.S.A. §§ 1011-1016. Until then, visitation rights in Vermont had been restricted to married biological parents. See *Lawrence v. Limoge*, 149 Vt. 569, 572-73, 546 A.2d 802, 803-04 (1988) (superior court lacked subject matter jurisdiction to award putative father visitation under separation statute because he was unmarried; neither this Court nor trial court may infer jurisdiction to determine visitation privileges of putative father in action brought under statute other than Parentage Proceedings Act). Since then, this Court has continued to refuse to allow courts to adjudicate disputes over parent-child contact outside the context of statutory proceedings. See *Rivers v. Gadwah*, 165 Vt. 568, 568-69, 679 A.2d 891, 891 (1996) (dismissing grandparents' visitation petition because it failed to fit within statutory jurisdictional constraints).

In 1990, the Legislature created the family court and gave it "all of the equitable and other powers of the superior court as to civil matters *within its jurisdiction*." 4 V.S.A. § 453(a) (emphasis added). The new court was granted exclusive jurisdiction to hear and dispose of custody disputes brought within various statutory proceedings. *Id.* §§ 454-455. Realizing that the family court lacks jurisdiction to adjudicate her claim, see *In re R.L.*, 163 Vt. 168, 171, 657 A.2d 180, 183 (1995) (family court is court of limited jurisdiction, and its jurisdic-

tional grant must be strictly construed),[4] plaintiff seeks equitable relief in the superior court, notwithstanding that (1) Vermont courts have intervened in custody and visitation matters only within the context of statutory proceedings, and (2) expansion of the courts' role in these matters has come only through legislative enactments or this Court's construction of statutes affecting parental rights and responsibilities. See, e.g., *B.L.V.B.*, 160 Vt. at 369-72, 628 A.2d at 1272-74 (construing adoption statute to hold that when family unit is comprised of biological mother and her partner, and adoption is in children's best interest, terminating biological mother's parental rights is unnecessary and unreasonable); *Paquette*, 146 Vt. at 86, 92, 499 A.2d at 26, 30 (construing divorce and separation statutes to empower court to award custody of child to stepparent when circumstances warrant).

Plaintiff acknowledges that no specific statutory or constitutional provisions require the superior court to assume jurisdiction over her claim, but she argues that public policy compels such a result, given her status as Sarah's de facto parent. We do not agree. The superior court's refusal to extend its jurisdiction here does not create circumstances "cruel or shocking to the average [person's] conception of justice." *Payne*, 147 Vt. at 493, 520 A.2d at 588. Persons affected by this decision can protect their interests. Through marriage or adoption, heterosexual couples may assure that nonbiological partners will be able to petition the court regarding parental rights and responsibilities or parent-child contact in the event a relationship ends. Nonbiological partners in same-sex relationships can gain similar assurances through adoption.

---

[4] The dissent would remand the instant matter to the *family* court even though plaintiff's suit was not filed in that court, her appeal is from a superior court decision, the parties have not claimed that the family court has jurisdiction to adjudicate their dispute, and, in fact, the family court does not have jurisdiction to do so. In the dissent's view, the family court has the authority to adjudicate this matter under 15A V.S.A. § 1-112(1), which gives the family court jurisdiction to hear and dispose of issues pertaining to parent-child contact if "two unmarried persons, who have adopted a minor child, terminate their domestic relationship." The problem with this analysis, of course, is that plaintiff never adopted Sarah. The dissent would have the family court determine whether plaintiff *equitably* adopted the child. Apparently, the dissent would tap the court's general equitable powers to provide jurisdiction to resolve this predicate question. As noted above, however, those powers may be exercised only within the limited statutory proceedings set forth in 4 V.S.A. §§ 454-455, which demarcate the family court's jurisdiction. See 4 V.S.A. § 453(a); *In re R.L.*, 163 Vt. 168, 171, 657 A.2d 180, 183 (1995).

■ In this case, plaintiff contends that she did not attempt to adopt Sarah at the time defendant did because the parties believed that Vermont's then-current adoption laws would not permit it. See 15 V.S.A. § 431 (repealed 1996) ("A person or husband and wife together . . . may adopt any other person . . . ."). The language of the statute, however, certainly did not preclude plaintiff from seeking to adopt Sarah; indeed, as of December 1991, when Sarah was only five months old, at least one Vermont probate court had allowed the female partner of a child's adoptive mother to adopt the child as a second parent. See *B.L.V.B.*, 160 Vt. at 373 n.3, 628 A.2d at 1274 n.3. Further, in June 1993, more than a year before plaintiff alleges that the parties' relationship ended, this Court construed the earlier adoption statute as allowing a biological mother's female partner to adopt the mother's child without the mother having to terminate her parental rights. *Id.* at 369, 628 A.2d at 1272.[5]

■ In 1996, the Legislature enacted a new adoption statute embracing our holding in *B.L.V.B.* and allowing unmarried adoptive partners to petition the family court regarding parental rights and responsibilities or parent-child contact. See 15A V.S.A. § 1-102(b) (if family unit consists of parent and parent's partner, and adoption is in child's best interest, partner of parent may adopt child without terminating parent's rights); 15A V.S.A. § 1-112 (family court shall have jurisdiction to hear and dispose of issues pertaining to parental rights and responsibilities and parent-child contact in accordance with statutory divorce proceedings when two unmarried persons who

---

[5] According to the dissent, we should not presume that the parties were aware of judicial decisions that would have permitted both of them to adopt Sarah. We do not presume the parties' knowledge of any judicial or statutory law; rather, we suggest that plaintiff should have at least attempted to adopt Sarah before seeking equitable relief based on her alleged perceived lack of a legal remedy. Equity will not aid those who fail to take advantage of a remedy available at law. See *Farm Bureau Mut. Auto. Ins. Co. v. Houle*, 118 Vt. 154, 158-59, 102 A.2d 326, 329 (1954) (citing maxims that equity will not interfere when there is adequate remedy at law, will not relieve party against mistake of law, and will not aid those who sleep on their rights or who act in ignorance of facts that could have been ascertained); see also *Sandstrom v. Chemlawn Corp.*, 904 F.2d 83, 87 (1st Cir. 1990) (having eschewed other legal remedies, plaintiff's invocation of equitable principles rings hollow; equity ministers to vigilant, not to those who slumber upon their rights); *Aldridge & Stroud, Inc. v. American-Can. Oil & Drilling Corp.*, 357 S.W.2d 8, 11 (Ark. 1962) (courts of equity do not sit to restore lost opportunities). If plaintiff wanted to adopt Sarah, she should have attempted to do so. If she had applied for an adoption, either the probate court or this Court would have permitted it under our adoption laws. See *In re B.L.V.B.*, 160 Vt. 368, 369, 373 n.3, 628 A.2d 1271, 1272, 1274 n.3 (1993). Instead, plaintiff made no attempt to adopt, but now seeks equitable relief years later.

have adopted minor child terminate their domestic relationship); see also 15 V.S.A. § 293(a) (amended version allows parents and step-parents, *whether married or unmarried,* to petition family court regarding parental rights and responsibilities and parent-child contact). Thus, same-sex couples may participate in child-rearing and have recourse to the courts in the event a custody or visitation dispute results from the breakup of a relationship.

Nor do other public-policy considerations compel the conclusion that courts should intervene to consider whether third parties claiming a parent-like relationship ought to be given parent-child contact with the children of fit parents. Indeed, many courts and commentators have noted the potential dangers of forcing parents to defend third-party visitation claims. See, e.g., *In re Ash,* 507 N.W.2d 400, 403 (Iowa 1993) (extending visitation rights to third parties would allow claims for visitation from various persons with special relationships to children, possibly requiring courts to divide children's time among several parties); 2 Clark, *supra,* § 20.7, at 542-43 (movement for wider visitation is in large part based on desire to vindicate rights of those seeking parent-child contact rather than to further children's interests; visitation petitions impose serious psychological stresses on children and heavy financial burdens on custodians who often do not have adequate financial resources to defend against suits).

Plaintiff insists that tests could be created to assure that only those third parties who have developed an intended and shared de facto-parent relationship with a child could petition for visitation. See *In re Custody of H.S.H.-K.,* 533 N.W.2d 419, 435-36 (Wis.), *cert. denied, Knott v. Holtzman,* 516 U.S. 975, 116 S. Ct. 475 (1995) (devising test for those seeking visitation to demonstrate parent-like relationship). We are not persuaded by this argument. Although we might recognize new legal rights that would permit the superior court to extend its equitable jurisdiction, jurisdiction should not rest upon a test that in effect would examine the merits of visitation or custody petitions on a case-by-case basis. In reality, such a fact-based test would not be a threshold jurisdictional test, but rather would require a full-blown evidentiary hearing in most cases. Thus, any such test would not prevent parents from having to defend themselves against the merits of petitions brought by a potentially wide range of third parties claiming a parent-like relationship with their child. See *Nancy S. v. Michele G.,* 279 Cal. Rptr. 212, 219 (Ct. App. 1991) (no matter how narrowly court defined "parent," allowing persons claiming parent-like relationship to seek visitation rights could expose legal parents to

litigation from long-standing day-care providers, relatives, successive sets of stepparents, or close family friends).

Plaintiff scoffs at the notion that various relatives, foster parents, and even day-care providers could seek visitation through court intervention, but the cases we have reviewed suggest that the possibilities are virtually limitless. See *In re Hood*, 847 P.2d 1300, 1301 (Kan. 1993) (day-care provider claiming right to visitation based on best interest of child and existence of substantial relationship between herself and child); *L. v. G.*, 497 A.2d 215, 219, 222 (N.J. Super. Ct. Ch. Div. 1985) (applying its inherent equitable powers, court concluded that adult siblings have right to visit minor siblings, subject to best interests of minors); *Bessette v. Saratoga County Comm'r*, 619 N.Y.S.2d 359, 359 (App. Div. 1994) (petition for visitation by former foster parents). Further, as some courts have noted, third parties could abuse the process by seeking visitation to continue an unwanted relationship or otherwise harass the legal parents. See *Hood*, 847 P.2d at 1304 (danger of parents being harassed by third-party visitation petitions is policy consideration that weighs against expanding classes of persons who may seek visitation).

In an effort to allay these concerns while still providing relief to this particular plaintiff, the dissent suggests that we employ the doctrine of equitable adoption. The dissent would have the family court determine on remand whether plaintiff would have adopted Sarah except for the perceived legal impediment; if so, plaintiff would be deemed the equitable adoptive mother, and the court presumably could accord her all the rights of a legal adoptive parent. Even if we ignore its inherent jurisdictional problems, the dissent's position does not withstand scrutiny.

Though the dissent disavows extending the doctrine of equitable adoption into the realm of equitable parentage, that is precisely what it is doing. As we stated in *Whitchurch v. Perry*, 137 Vt. 464, 470-71, 408 A.2d 627, 631 (1979):

> Courts generally apply the doctrine of equitable adoption *in cases of intestate succession* to permit participation in the estate by a foster child who was never legally, *i.e.*, statutorily, adopted by the decedent. Typically the decedent obtained custody by expressly or implicitly promising the child, the child's natural parents, or someone *in loco parentis* that an adoption would occur. Custody is transferred and the child lives with the foster parent as would a natural child, but, *for one reason or another* (usually the promisor's

> neglect), an adoption never occurs. Upon the foster parent's death, a court, applying the maxim that "equity regards that as done which ought to be done," declares that the child is entitled to share in the estate as if he were a legally adopted child.

(Emphasis added.) For the doctrine to apply, there must either be an *agreement to adopt* or an *undertaking* to effect a statutory adoption, *id.* at 471, 408 A.2d at 631, neither of which took place here. In *Whitchurch*, we declined to expand the doctrine to confer on the plaintiffs a "next of kin" status to provide standing for them to bring a wrongful death action, stating that the doctrine of equitable adoption "permits enforcement of the promise of inheritance implied from the agreement to adopt, but it does not alter the *status* of the parties." *Id.* at 472, 408 A.2d at 632. Rather, we noted, it "merely confers a right of inheritance." *Id.* It is obvious from the discussion in *Whitchurch* that in this case the dissent would not be employing the doctrine of equitable adoption, but rather a much more expansive variant thereof aimed at allowing "equitable parents" to interfere with the custodial rights of legal parents. See *Pierce v. Pierce*, 645 P.2d 1353, 1355 (Mont. 1982) (doctrine of equitable adoption had no application to proceeding where stepfather was seeking to establish custodial rights over his former stepchild against wishes of biological mother).

Ironically, after stretching the doctrine of equitable adoption beyond recognition in an effort to provide relief to this particular plaintiff, the dissent would then let it snap back into place to prevent any future plaintiffs from taking advantage of its expanded form. But there is no principled way to adopt the equitable-parent doctrine for this one case. Indeed, the dissent's avowed purpose for affording plaintiff relief — to achieve an equitable and just result — contradicts its desire to limit the application of that doctrine. If achieving an equitable result is the goal, then a wide variety of reasons for failing to adopt — lack of funds or fear of discrimination by the adopting agency, for example — could form the basis for the family court's jurisdiction to resolve factual disputes concerning whether a nonparent equitably adopted a legal parent's child. We decline to join the dissent's expansion of a judicial doctrine for the sole purpose of creating jurisdiction in the family court to benefit this particular plaintiff, only to foreclose all others having legitimate reasons for failing to adopt from seeking such equitable relief. Very few jurisdictions have embraced the equitable-parent doctrine adopted in

*Atkinson v. Atkinson,* 408 N.W.2d 516, 519 (Mich. Ct. App. 1987). See *In re Marriage of Goetz & Lewis,* 250 Cal. Rptr. 30, 33 (Ct. App. 1988) (given complex practical, social, and constitutional ramifications of equitable-parent doctrine, legislature is better equipped to consider expansion of categories of persons who may petition for visitation and custody); *In re Marriage of O'Brien,* 772 P.2d 278, 283 (Kan. Ct. App. 1989) (declining to adopt equitable-parent doctrine because it would open courthouse doors to all individuals claiming rights based on equitable adoption). Among the few courts that have adopted the doctrine, however, we have not found any that have limited it in the manner proposed by the dissent. Cf. *Whitchurch,* 137 Vt. at 471, 408 A.2d at 631 (equitable-adoption doctrine is typically invoked when foster parents had agreed to adopt child, but failed to do so *for one reason or another*).

We recognize that, in this age of the disintegrating nuclear family, there are public-policy considerations that favor allowing third parties claiming a parent-like relationship to seek court-compelled parent-child contact. In our view, however, these considerations are not so clear and compelling that they require us to acknowledge that de facto parents have a legally cognizable right to parent-child contact, thereby allowing the superior court to employ its equitable powers to adjudicate their claims. Given the complex social and practical ramifications of expanding the classes of persons entitled to assert parental rights by seeking custody or visitation, the Legislature is better equipped to deal with the problem. See *Nancy S.,* 279 Cal. Rptr. at 219; *O'Dell v. O'Dell,* 629 So. 2d 891, 891 (Fla. Dist. Ct. App. 1993) (raging debate that exists concerning wisdom of granting child visitation to substitute parents is matter best left for legislature), *appeal dismissed,* 637 So. 2d 236 (Fla. 1994); *Hood,* 847 P.2d at 1303-04 (legislature must decide if and when intrusion into family unit in form of third-party visitation is justified by legitimate state interest; legislature is forum to entertain sociological and policy considerations bearing on well-being of children). Deference to the Legislature is particularly appropriate in this arena because the laws pertaining to parental rights and responsibilities and parent-child contact have been developed over time solely through legislative enactment or judicial construction of legislative enactments. See *Finck v. O'Toole,* 880 P.2d 624, 627 (Ariz. 1994) (legislative scheme naming specific classes of parties to whom visitation may be granted, and imposing substantial limitations on statutorily granted visitation rights, suggests that legislature did not intend to award visitation to unspecified third parties).

█ For the reasons stated, we concur with the superior court's conclusion that it was without authority to consider plaintiff's petition for visitation. See *Curiale v. Reagan*, 272 Cal. Rptr. 520, 522 (Ct. App. 1990) (jurisdiction to adjudicate custody depends upon there being some proceeding properly before court; same-sex partner who was not biological parent of child had no standing to avail herself of statutory custody proceedings); *Ash*, 507 N.W.2d at 404 (courts lack power to order visitation absent statutory or common-law authority recognizing legal right); *Olds*, 356 N.W.2d at 572 (trial court had no authority outside context of statute to consider petition in equity for visitation); *Alison D. v. Virginia M.*, 572 N.E.2d 27, 28-29 (N.Y. 1991) (although same-sex partner had close and loving relationship with child, she was not parent within meaning of statute and thus had no standing to seek visitation); cf. *H.S.H.-K.*, 533 N.W.2d at 430-31 (because courts in Wisconsin adjudicated visitation before it was regulated by statute, trial court had equitable power to hear visitation petition outside context of statute, notwithstanding that "custody" continues to be governed exclusively by statutory proceedings). We decline to judicially create a right of unrelated third-party visitation actionable in superior court pursuant to the court's equitable powers and subject only to the court's discretion — a right that would exist above and beyond the circumscribed rights granted by the Legislature. Were we to do so, we would establish, in effect, a two-tiered system in which persons who could not bring their visitation and custody petitions in statutory proceedings before the family court would turn to the superior court for relief. The Legislature did not contemplate such a system, and the law does not compel it.

Obviously, our opinion should not be read as impeding same-sex partners from child-rearing or as minimizing the importance of maintaining relationships between children and third parties with whom the children have formed significant bonds. But absent statutory authority extending the family court's jurisdiction to adjudicate third-party visitation requests, cf. Or. Rev. Stat. § 109.119(1) (1989) (any person who has established emotional ties creating a child-parent relationship may petition for custody or visitation rights), legal parents retain the right to determine whether third-party visitation is in their children's best interest. *Finck*, 880 P.2d at 627.

*Affirmed.*

**Morse, J.,** dissenting. I respectfully dissent. The Court rejects plaintiff's effort to establish visitation with the minor child on the ground that there is no legal right by which the court might fashion

an equitable remedy, and the Court is unwilling to create a new legal right of "equitable parentage." Although other courts have embraced the concept, see, e.g., *In re Custody of H.S.H.-K.*, 533 N.W.2d 419 (Wis.), *cert. denied, Knott v. Holtzman*, 516 U.S. 975, 116 S. Ct. 475 (1995) (court may grant visitation to former lesbian partner if petitioner proves parent-like relationship with minor child), I agree with the Court that the social implications of the equitable-parent doctrine are sufficiently complex that any major policy decision in this area properly rests with the Legislature. That is not, however, the only avenue of relief available to plaintiff.

As explained more fully below, the doctrine of "equitable adoption" provides an alternative, well-established remedy that is well suited to the factual circumstances of this case. Based on the law as it was reasonably understood at the time, plaintiff was compelled to forego the opportunity, together with her partner, to adopt the minor child as any other married couple could have done. That law subsequently changed, and so, unfortunately, did plaintiff's domestic circumstances. It is too late apparently for the parties to cooperate, but not for the law to provide a just remedy, by permitting plaintiff to establish an *intent* to adopt and thus preserve the critically important parent-child relationship.

The Court dismisses this approach out of hand. Apart from a rather unrestrained accusation of unprincipled special pleading on behalf of plaintiff, the actual reasons offered by the Court unravel upon detached analysis. This is not a particularly difficult case. Although the context is novel, the legal principle is settled and the facts are compelling.

As we observed in *Whitchurch v. Perry*, 137 Vt. 464, 470-71, 408 A.2d 627, 631 (1979) (emphasis added):

> Courts generally apply the doctrine of *equitable adoption* in cases of intestate succession to permit participation in the estate by a foster child who was never legally, *i.e.*, statutorily, adopted by the decedent. . . Custody is transferred and the child lives with the foster parent as would a natural child, but, for one reason or another . . . an adoption never occurs. Upon the foster parent's death, a court, applying the maxim that "equity regards that as done which ought to be done," declares that the child is entitled to share in the estate as if he were a legally adopted child.

Although courts have traditionally characterized the concept as an equitable remedy for an unperformed "contract" to adopt, in reality

the agreement "to adopt is found when a close relationship, similar to parent-child, exists between a child and the deceased." *Atkinson v. Atkinson*, 408 N.W.2d 516, 520 (Mich. Ct. App. 1987); see also *First Nat'l Bank v. Phillips*, 344 S.E.2d 201, 203 (W. Va. 1985) (rejecting contract notion as "unnecessary fiction" and relying instead on evidence of love and affection between parent and child and outward representations of parent-child relationship). An agreement to adopt may be inferred from the "acts, conduct and admissions of the parties and other relevant facts and circumstances," *Cavanaugh v. Davis*, 235 S.W.2d 972, 975 (Tex. 1951), which might include such evidentiary facts as an assumption by the child of the deceased's surname, identification of the deceased as the child's parent on school and other formal records, and, most significantly, evidence of a relationship of love and affection between the deceased and the child. The concept of equitable adoption has been recognized both in Vermont, *Whitchurch*, 137 Vt. at 470-71, 408 A.2d at 631, and broadly across the country. See Annotation, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel*, 97 A.L.R.3d 347 (1980) (collecting cases).

While equitable adoption most commonly involves a child's effort to share in the intestate estate of a foster parent who had intended to adopt, it has been applied in a variety of other contexts. It has been invoked, for example, to entitle a child to maintain an action for the wrongful death of a foster parent where the evidence disclosed an unconsummated intent to adopt. See *Holt v. Burlington Northern RR.*, 685 S.W.2d 851, 857 (Mo. Ct. App. 1984); *Bower v. Landa*, 371 P.2d 657, 661 (Nev. 1962). It has also been extended to allow a parent to obtain the death benefits of a child under a workers' compensation statute where the evidence disclosed an unfulfilled intent to adopt the deceased child. *Jones v. Loving*, 363 P.2d 512, 515 (Okla. 1961). And in a recent Michigan case, the doctrine was invoked to support the parental rights of a nonbiological father to the daughter born while he was married to the mother. *Atkinson*, 408 N.W.2d at 520.

We need not go as far as the Michigan court, which adopted the broader doctrine of equitable parentage, *id.* at 519, to recognize that the principle of equitable adoption has valid applications outside the context of inheritance law. Here I propose an application much closer to the original equitable-adoption concept. The purpose of the doctrine, as noted, is to allow a court to find, in retrospect, an intent to adopt by a person who had never formally done so, for the purpose of achieving a just result. Plaintiff in this matter contends that she would have adopted the minor child when she was born in 1991, but

that the adoption statute then appeared to allow only one nonmarried person to adopt, and defendant was designated as the adoptive parent. The rules of adoption were liberalized in 1993, when the Court recognized the right of a nonmarried parental partner to adopt, see *In re B.L.V.B.*, 160 Vt. 368, 369-73, 628 A.2d 1271, 1272-74 (1993), and substantially revised in 1996, when the Legislature enacted a new adoption statute formally recognizing the right of nonmarried cohabitants to freely adopt. See 15A V.S.A. § 1-102(b) (if family consists of parent and parent's partner, and adoption is in child's best interest, partner of parent may adopt child without terminating parent's rights); see also 15A V.S.A. § 1-102(a) ("[A]ny person may adopt or be adopted by another person for the purpose of creating the relationship of parent and child between them.").

Given these subsequent rule changes, plaintiff, in my view, should be accorded the opportunity to demonstrate on remand that, except for the perceived legal impediment in light of her personal circumstances at that time, she would have adopted the minor child as did defendant. Plaintiff should be allowed to prove, in other words, an intent to establish an adoptive relationship with the child that was never formally consummated because of the then current state of the law. All that this amounts to, in effect, is application of the principle of equitable adoption in a novel factual context — a retrospective inquiry by the court into whether plaintiff intended, but because of the then-current adoption statute failed, to effectuate an adoption of the minor child, to the end of achieving a fair result.

In such a proceeding, plaintiff would be allowed to adduce evidence identical to that generally considered to be material in the equitable-adoption context — reciprocal love and affection between parent and child, holding-out as the parent, "parental" designation on official forms, and the like. Indeed, without purporting to prejudge the issue, I would note in this regard that plaintiff alleges she was the minor child's primary caretaker: she dressed and fed the minor every morning before driving her to daycare, spent extensive time with the minor playing, talking and reading, and exercised primary responsibility for the minor during the evening. Plaintiff also allegedly shares a surname with the minor ("Dexter-Titchenal") and is listed as the minor's parent on her daycare enrollment form, probate records, and baptismal papers. Defendant's last will and testament further states that plaintiff has "shared in the parenting of [the minor] since the day [she] came into [their] lives." Should plaintiff establish these allegations at trial and persuade the court of her intent to adopt, she would

be accorded the legal status of an adoptive parent, and the family court could then resolve the visitation issue as though it were a regular dissolution proceeding, determining what is in the best interests of the child.

In adopting this approach, the court would not be "creating" any new legal rights; adoptive parents have all of the rights and responsibilities of a natural parent, including the right, upon termination of the parents' relationship, to seek visitation. 15A V.S.A. §§ 1-104, 1-112. We merely apply a settled equitable remedy — equitable adoption — to recognize retrospectively the adoptive relationship between plaintiff and the minor in order to achieve an equitable result.

As for the proper court in which to adjudicate plaintiff's claim, the Legislature has recently made it clear that family court is the appropriate venue. As expressly provided in 15A V.S.A. § 1-112:

> The family court shall have jurisdiction to hear and dispose of issues pertaining to parental rights and responsibilities, parent-child contact and child support . . . under the following circumstances:
>
> (1) If *two unmarried persons, who have adopted a minor child,* terminate their domestic relationship;

(Emphasis added.) Furthermore, the family court has "all of the equitable . . . powers of the superior court as to civil matters within its jurisdiction." 4 V.S.A. § 453(a). Thus, if the family court finds that plaintiff intended to adopt the minor child, it would adjudicate the matter as any other dissolution between "two unmarried persons, who have adopted a minor child," 15A V.S.A. § 1-112(1), resolving visitation rights and related issues in the best interests of the child.

A decision along these lines would present none of the drawbacks of a broader holding recognizing the rights of "equitable parents." It would apply only to this case, and any other in which a party allegedly failed to adopt because it was not a reasonable legal option. It is safe to assume that the courts will not be flooded with similar claims. Indeed, the number of potential claimants is finite by definition, since the holding would apply only to those who, like plaintiff, allegedly failed to adopt prior to the 1996 statutory changes in the adoption law. This approach also shields the family courts from the most common and problematic situation in which a cohabitant lives with the natural parent and child for some period of time, separates, and then seeks parental rights. Since the parties could have married and the

cohabitant could have adopted, our holding would plainly not extend to them. In sum, a holding along the lines outlined above holds the promise of fairness, yet avoids the real risks, identified by the Court, of a broader-based holding recognizing the rights of equitable parents.

The Court, nevertheless, rejects this approach on three grounds. First, it claims the family court lacks jurisdiction to adjudicate such a matter. As explained above, however, the family court is expressly empowered to "hear and dispose of issues pertaining to parental rights and responsibilities [of] . . . two unmarried persons, who have adopted a minor child," 15A V.S.A. § 1-112, and is further vested with full "equitable . . . powers" to determine whether one of the parties is entitled to adoptive-parent status. 4 V.S.A. § 453(a).

Second, the Court rather colorfully chides the dissent for "stretching the doctrine . . . beyond recognition in an effort to provide relief to this particular plaintiff" while providing no "principled" justification or limitation. 166 Vt. at 384, 693 A.2d at 689. These are the same old stale and discredited charges that "law" has brought against "equity" since the days of Henry II. The principle in this case is indeed suited to *this* plaintiff, but that makes it no more "unprincipled" than any other equitable doctrine, unless the Court also considers equitable estoppel, equitable servitudes, constructive trusts, specific performance, and every other equitable remedy to be unprincipled. Furthermore, there is a plain and principled basis for extending the equitable-adoption doctrine to this plaintiff (and anyone similarly situated) and no further, that the Court simply ignores. Plaintiff was effectively barred from adopting the minor by the law in effect when she and defendant were together. This unique fact justifies an extension of equitable relief to this plaintiff, and establishes a principled basis to exclude others who might wish to take advantage of the doctrine.

Finally, the Court advances the remarkable proposition that plaintiff somehow could, and should, have attempted to adopt the minor child prior to the couple's separation in 1994. The Court observes that one probate court in 1991 had allowed an adoption in similar circumstances, and that in 1993 we issued our decision in *B.L.V.B.* broadening the right of nonmarried cohabitants to adopt. It is one thing to presume that parties are aware of, and bound by, general enactments of the Legislature that amend the law; it is quite another, however, to impute to a nonattorney specific knowledge of one probate decision and a later, confirming appellate court decision. The

rule that everyone is presumed to know the law, and the corollary that ignorance of the law is no excuse, is a rule of necessity designed to ensure that mere ignorance does not immunize one who commits a crime from its penal consequences. See *Brent v. State*, 43 Ala. 297, 302 (1869) ("[T]hat everybody is presumed to know the law . . . is a rule of presumption, adopted from necessity, and to avoid an evil that would otherwise constantly perplex the courts, in the administration of the criminal law; that is, the plea of ignorance."). As one court has observed, however, "[t]he necessity does not go further in civil matters so as to punish, punitively, on the strength of the legal presumption, which more often than otherwise is against the truth." *Topolewski v. Plankinton Packing Co.*, 143 Wis. 52, 73 (1910). It would be contrary to common sense and fairness to conclude that plaintiff, or anyone similarly situated, should have known that she had the legal right to adopt prior to the effective date of 15A V.S.A. § 1-102.

It is especially unfair in this case to assert, as the Court does, that plaintiff somehow "slumbered" and was less than vigilant. Plaintiff and defendant wanted a child to raise together as their own. They were not seeking to become a "test case" for the rights of gay and lesbian parents, nor should they have been expected to do so. They obeyed the law as it was then reasonably understood, and they had no cause to challenge it. They could not anticipate that the law would change, any more than they could anticipate that their relationship would change. But change they did, and by then it was too late to obtain the cooperation from defendant that would have avoided this dispute. It is wrong to suggest that plaintiff somehow brought this problem upon herself.

For all of the foregoing reasons, I would remand the matter to the family court for further proceedings consistent with the views expressed herein. Justice Johnson joins in the dissent.