725 A.2d 13 (1999)
319 N.J. Super. 103
V.C., Plaintiff-Appellant,
v.
M.J.B., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued December 16, 1998.
Decided March 5, 1999.
*14 Robin T. Wernik, Matawan, for plaintiff-appellant (Granata, Wernik & Zaccardi, attorneys; Ms. Wernik, of counsel and on the brief).
Anne W. Elwell, Montclair, for defendant-respondent (Elwell and Albino, attorneys; Ms. Elwell, on the brief).
Brief was filed by amicus curiae American Civil Liberties Union of New Jersey, American Civil Liberties Union Foundation, Lambda Legal Defense and Education Fund, National Center for Lesbian Rights and Lambda Families of New Jersey (David M. Wildstein of Wilentz, Goldman & Spitzer, Woodbridge, attorney; David Rocah, American Civil Liberties Union of New Jersey, and Michael Adams, Leslie Cooper and Matthew Coles, ACLU Foundation, on the brief).
Before Judges STERN, BRAITHWAITE and WECKER.
The judgment of the court was announced in an opinion by STERN, P.J.A.D.
Plaintiff appeals from a judgment of the Family Part entered on September 18, 1998 which denied her request for joint legal custody of J.B. and J.M.B, "terminated" her visitation with the children and "cease[d] immediately" "all further contact between the plaintiff and the children of defendant." We denied a stay but accelerated the appeal.
Before us plaintiff V.C. argues that the denial of joint custody and visitation "where it is indisputable that [she] was a psychological parent of J.M.B. and J.B. was reversible error," that the denial of both was "contrary to the children's best interest" and that "the court erred in not finding that it is in the best interest of the children for [her] to be granted parental rights and that [defendant] M.J.B. should be estopped from denying V.C. these rights." For the reasons stated in this opinion and Judge Braithwaite's opinion, we affirm the judgment denying plaintiff's application for joint custody. For the reasons stated in this opinion and the opinion of Judge Wecker, we reverse the order denying her request for visitation.

I.
Plaintiff and defendant are women who maintained a lesbian relationship lasting almost four years. The critical facts were well stated by the trial judge:[1]
The plaintiff, V.C., and defendant, M.J.B., first met during 1992, and began to date on July 4, 1993. Five days later, on July 9th, M.J.B. began to see fertility doctor, Patricia Hughes, for the purpose of becoming pregnant through artificial insemination. In preparation for this first appointment, M.J.B. had to record her body temperature for eight to nine months prior, so as to enable Dr. Hughes to track her ovulation schedule. Later, in September 1993, V.C. became aware of M.J.B.'s visits to Dr. Hughes and her decision to have a baby via artificial insemination.
As part of the preparation for becoming artificially inseminated, a sperm donor had to be selected. According to V.C., the decision about the sperm donor had been a private one made by herself and M.J.B. However, testimony in court indicated M.J.B. had discussed this decision with almost everyone she came in contact with during the time. Additionally, the testimony portrayed M.J.B. as having been the one to make the final decision about which sperm donor to use.
Between November 1993 and February 1994, M.J.B. went through several Intrauterine Insemination procedures, and, on February 7, 1994, M.J.B. was informed she was pregnant. During M.J.B.'s pregnancy, both M.J.B. and V.C. prepared for the birth of the twins, J.A.B. and J.M.B. The parties moved from M.J.B.'s apartment, where they had been living together since *15 December 1993, into a larger apartment which would be able to accommodate all four of them. V.C. and M.J.B. also prepared wills, powers of attorney, named each other as the beneficiary for their respective life insurance policies and opened a joint checking account for their household expenses. The parties also decided to have the children call M.J.B. "Mommy" and V.C. "Meema."
V.C. was very involved during M.J.B.'s pregnancy. V.C. attended all Lamaze classes with M.J.B. and was present in the delivery room when the children were born on September 29, 1994. After the children's birth, M.J.B. took three months maternity leave, and V.C. took three weeks vacation time.
The decision about which pediatrician and day care to use were researched and made by M.J.B. but, in each instance, M.J.B. brought V.C. to visit the place she had selected. Also, M.J.B. listed V.C. as the "other mother" on the children's pediatrician and day care registration forms.
In February 1995, V.C. and M.J.B. jointly purchased a house and, later that year, the two were "married" in a commitment ceremony. The children were present at the ceremony and, at the conclusion of the ceremony, V.C., M.J.B. and the children were blessed as a family. At some point, the parties also opened savings accounts for each of the children and named V.C. as the custodian for one account and M.J.B. the custodian for the other. After the children were born, the parties talked about V.C. adopting the children, but were advised to wait until the children were older. In June 1996, the parties went to see an attorney regarding V.C. adopting the children. During this meeting, M.J.B. gave the attorney a two thousand dollar retainer and the parties were instructed to get letters from friends and family indicating V.C., M.J.B., and the two children functioned as a family. Neither party actively pursued getting the letters or proceeding with the adoption.
Two months later, in August 1996, M.J.B. ended her relationship with V.C. From August until November 1996, the parties took turns living in the house with the children. By December V.C. had moved out, but spent approximately every other weekend with the children. During this time V.C. contributed money towards the children's expenses. In May 1997, M.J.B. left the children with V.C. for two weeks while M.J.B. was away on business. At some point on or around this time, M.J.B. stopped accepting money from V.C. for the children.
Since the dissolution of the relationship between the parties, both women have become involved with new partners. M.J.B. and the children presently live with M.J.B.'s new partner, and V.C. is currently living with her new partner.
The trial judge also carefully detailed additional testimony of the fact witnesses offered by the respective parties:
During the trial, V.C. asserted she and M.J.B. had jointly decided to have the children. V.C. testified she and M.J.B., as a couple, decided which sperm donor to use and later what the children should be named. V.C. presented cards and letters given to her by M.J.B. during their relationship which referred to V.C. as a mother to the children and the four of them as a family. V.C. also testified she and M.J.B. were co-parents and each of them had an equal share of parenting responsibilities. According to V.C., both parties were involved in all aspects of decision-making regarding the children. Also, V.C. testified she and M.J.B. had discussed changing the children's last name to a hyphenated form of both women's names, and planned for V.C. to adopt the children. According to V.C., even after the parties separated, M.J.B. had indicated she was still willing to go forth with the adoption.
V.C.'s mother, [S.D.], corroborated much of V.C.'s testimony. Ms. [D.] testified M.J.B. had told her both parties would be co-parents to the children. According to Ms. [D.], M.J.B. had said she (M.J.B.) and V.C.jointly made the decision to have the children and the children would belong to both parties. Additionally, Ms. [D.] testified M.J.B. and V.C. undertook equal parenting roles and functioned as a family *16 after the children were born. Ms. [D.] also said the children referred to her as "Grandma" and were very attached to V.C.'s family.
[L.M.] also testified on behalf of V.C. Ms. [M.] indicated she had known and worked with M.J.B. for many years prior to having met V.C. Ms. [M.] testified to having spent time with the parties before, during and after M.J.B.'s pregnancy and the subsequent birth of the children. She remembered having regarded both M.J.B. and V.C. as equal parents to the children while the parties were together. According to Ms. [M.], after the parties separated, M.J.B. told her she (M.J.B.) planned to maintain the relationship between the children and V.C.
[D.B.], who also worked with M.J.B., testified for V.C. According to Ms. [B.], M.J.B. indicated she (M.J.B.) intended to maintain the relationship between the children and V.C. so long as V.C. continued to contribute money toward the children's expenses. Ms. [B.] also remembered having heard V.C. refer to herself as a parent to the children, and maintained she too viewed V.C. as being the children's co-parent.
M.J.B. testified to having encouraged a loving relationship between V.C. and the children, but denied having made the decision to get pregnant with V.C. According to M.J.B., she had planned to be artificially inseminated since the late 1980's, and had already decided to go ahead with it prior to becoming involved with V.C. She acknowledged having talked to V.C. about the sperm donor and the children's names, but said she also talked about those decisions with almost everyone she came in contact with during the time she was making those decisions. M.J.B. was adamant about having made all final decisions regarding the children.
M.J.B. remembered having thought of the children as theirs (M.J.B.'s and V.C.'s) at times, but at other times thought of the children as hers alone. M.J.B. did acknowledge having thought of the four of them as a family while the relationship was intact. According to M.J.B., V.C. spent a lot of time and assumed a great deal of responsibility with the children, but added V.C. was more her helper than a co-parent. When asked about the potential adoption of the children by V.C., M.J.B. said she had considered it and had consulted an attorney with V.C. about it, but in the end, decided she was not comfortable with V.C. adopting her children. M.J.B. acknowledged the loving relationship the children have with V.C., but also maintained she did not want the children to continue this relationship with V.C. M.J.B. said she, the children and her new partner were a family now.
[A.R.] testified on behalf of M.J.B. Ms. [R.] confirmed M.J.B. had been interested in becoming artificial[ly] inseminated for years prior to having met V.C. Ms. [R.] remembered M.J.B. having decided to proceed with the artificial insemination process prior to the commencement of M.J.B.'s relationship with V.C. Ms. [R.] did not remember whether she had ever heard V.C. refer to herself as a parent to the children, but did acknowledge V.C. having played an important role in the children's lives when the parties were together. However, according to Ms. [R.], V.C. would usually only share in the household responsibilities when M.J.B. would ask her to, and not usually upon her own initiative.
[M.I.] also testified on M.J.B.'s behalf. Ms. [I.] testified to having known M.J.B. prior to meeting V.C. She recalled conversations she had had with M.J.B. about M.J.B. becoming pregnant via artificial insemination years before M.J.B. and V.C. became involved. Ms. [I.] did not recall ever having heard V.C. refer to herself as a parent to the twins either before or after their birth, and did not know of M.J.B. having regarded V.C. as a co-parent to the children.
Before reaching his conclusion, the trial judge also set forth the expert testimony admitted into evidence:
Both parties had expert witnesses testify on their behalf. Dr. Allwyn J. Levine testified on behalf of the plaintiff, and Dr. David Brodzinsky testified for the defense. Both experts came to very similar conclusions *17 after having examined both women and the two children. Each expert examined V.C. and M.J.B. individually and with the children as well as having interviewed the children individually.
After conducting his examination, Dr. Levine concluded both children view V.C. as a maternal figure and V.C. views the children as her own. Dr. Levine compared the relationship between V.C. and M.J.B. to a heterosexual marriage and said the children would be affected by the loss of V.C. in the same way children would be impacted if denied access to one parent after a divorce. He emphasized the benefit the children received and would continue to receive via the bonded relationship with V.C. Dr. Levine also testified as to the potential impact to the children's self-esteem by feelings of abandonment if they lost V.C. as a maternal figure. However, because the children are only three and a half and have lived apart from V.C. since they were two, Dr. Levine felt, the children would, if necessary, probably recover from the loss of V.C. Dr. Levine also acknowledge[d] the animosity between V.C. and M.J.B. as potentially detrimental to the children, but suggested counseling as a possible solution to improving relations between the parties.
Similarly, Dr. Brodzinsky found a bonded relationship to exist between V.C. and the children, which has been beneficial to the children. During his interviews with the children, they said they regarded V.C. as being a part of their family, which Dr. Brodzinsky said was normal for children of their age to express about a person with whom they have spent such a considerable amount of time. Dr. Brodzinsky felt the children may stop viewing V.C. as being a family member as they get older and learn more about biological relationships. Dr. Brodzinsky agreed it would be ideal for the children to maintain the bonded relationship with V.C., but feared the children would continue to be caught in the middle given the animosity between the parties. Dr. Brodzinsky agreed with Dr. Levine about the short-term distress the children would probably feel at the loss of V.C., but also felt the children would likely recover without any permanent damage. Dr. Brodzinsky disagreed with Dr. Levine about how the relationship between V.C. and M.J.B. should be viewed. Dr. Brodzinsky felt the loss of V.C. was not comparable to the loss of a parent in a heterosexual divorce because, in a heterosexual relationship, society would reinforce the expectation for a relationship to continue between a child and parent post-divorce, whereas no similar expectation would exist for the relationship between V.C. and the children.
Dr. Levine testified that "because the children were basically parented from birth" by plaintiff and defendant "until they physically separated," the children "see them as inter-changeable maternal mothering objects" and "have established a maternal bond with both of the women." With regard to the animosity between the parties,[2] Dr. Levine testified that the party who cannot set aside her anger towards a former spouse or lover should obtain counseling or therapy as opposed to depriving the children of the relationship with a parent. Dr. Brodzinsky indicated that continued animosity between the parties would negatively impact on the children, but also noted that counseling or therapy would help reduce the animosity. Neither expert suggested denying visitation to a parent based on animosity between the parties. Dr. Brodzinsky indicated that "I have seldom worked in a divorce situation where there isn't some ability to reduce animosity." He testified that "[t]he ideal situation is that Miss B is allowed to get on with her life as she wants, but to the extent possible that ... these children be able at times to have some contact with Miss C who's important to them." His recommendation was "[a]ssuming reasonable relationships between the adults at least reasonably amicable, that [the children] would probably benefit from ongoing *18 contact as they would with any person with whom they have a good solid relationship that can nurture them."

II.
The trial judge denied plaintiff's application for custody, concluding that "while there is evidence in the present case of the plaintiff enjoying a bonded relationship with the children, the plaintiff has failed to establish the relationship to have risen to the level of in loco parentis." He wrote:
The decision to have the children was clearly the defendant's rather than a joint decision by both parties. At the time V.C. and M.J.B. first began to date, defendant had not only made an appointment with a doctor to begin the artificial insemination process, but had collected at least eight months worth of information so as to enable the doctor to track her ovulation pattern. Additionally, testimony from the defendant and other witnesses confirmed the medical evidence of the defendant's intention to undergo artificial insemination prior to the beginning of her relationship with the plaintiff.
Both experts testified as to the strong bonded relationship between the plaintiff and the children, but this relationship was not proven to go so far as to establish the plaintiff as a "psychological parent" to the children. Both reports indicate the children view the defendant's new partner as similar to the plaintiff and neither report has either child independently identifying the plaintiff as their mother when asked who their mother is. Given the level of importance surrounding the issue of custody of children, and the lack of definitive evidence, this Court is unwilling to impute a relationship of psychological parent upon the plaintiff. The present case lacks the kind of clear parental relationship between the plaintiff and the children which was present in other cases where a claim of psychological parent was successfully argued. See Matter of the Guardianship of J.C., J.C., J.M.C., Minors, 129 N.J. 1, 608 A.2d 1312 (1992); Hoy v. Willis, 165 N.J.Super. 265, 398 A 2d 109 (App.Div. 1978); A.S. v. B.S., 139 N.J.Super. 366, 354 A.2d 100 (Ch.Div.1976).
Because the plaintiff failed to prove she stood in loco parentis and, functioned as a psychological parent to the children, this Court cannot proceed to analyze the present custody case under the best interest test. Absent a showing of plaintiff having acted in loco parentis, the Court would only be able to consider the plaintiff's petition for custody if the plaintiff was able [to] prove the defendant to be an unfit parent. As this has not been alleged, nor is there any evidence to substantiate such a claim, the plaintiff's motion for joint legal custody must be denied.
The trial judge also denied plaintiff the privilege of visitation because an in loco parentis relationship with a stepchild "terminate[s] once the relationship between the adults is ended." Under the test adopted by the Wisconsin Supreme Court in Custody of H.S.H.-K., 193 Wis.2d 649, 533 N.W.2d 419 (1995), the trial judge found plaintiff had established a "bonded," but not a "parental," relationship and had not "assumed obligations of parenthood," and concluded, in any event, that because of the "animosity" caused by defendant[3] and the fact that "defendant resents the plaintiff's presence in her life and this attitude is inevitably passed along to the children," visitation is not in "the best interest" of the children. We disagree with the trial judge's conclusion that this "bonded relationship with the children ... [does not rise] to the level of in loco parentis."[4] Accordingly, the critical issue to be decided is whether the granting of joint custody or visitation is in the "best interests" of the children. In so deciding, we recognize that here plaintiff seeks neither physical custody nor sole legal custody and that defendant *19 questions plaintiff's entitlement to enjoy any parental rights. In determining the issues before us, we also indicate our view that this is a subject which warrants legislative review and consideration. However, we must resolve the dispute at hand in light of the present statutes and existing case law. We do not write on a clean slate.

III.
N.J.S.A. 9:2-3 provides:
[w]hen the parents of a minor child live separately, or are about to do so, the Superior Court, in an action brought by either parent, shall have the same power to make judgments or orders concerning care, custody, education and maintenance as concerning a child whose parents are divorced.... (emphasis added.)
N.J.S.A. 9:2-4 further provides, in part, that:
[t]he Legislature finds and declares that it is in the public policy of this State to assure minor children of frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and that it is in the public interest to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy.
In any proceeding involving the custody of a minor child, the rights of both parents shall be equal ... (emphasis added.)
The statute defines "parent," "when not otherwise described by the context," to mean a "natural parent or parent by previous adoption." N.J.S.A. 9:2-13(f). In dealing with similar issues of custody and visitation of artificially inseminated children sought by a former lesbian partner of the natural mother, the California Court of Appeals interpreted its Uniform Parentage Act by stating:
[E]xpanding the definition of a `parent' in the manner advocated by the appellant could expose other natural parents to litigation brought by child-care providers of long standing, relatives, successive sets of stepparents or other close friends of the family. No matter how narrowly we might attempt to draft the definition, the fact remains that the status of individuals claiming to be parents would have to be litigated and resolution of these claims would turn on elusive factual determinations of the intent of the natural mother, the perceptions of the children, and the course of conduct of the party claiming parental status. By deferring to the Legislature in matters involving complex social and policy ramifications far beyond the facts of the particular case, we are not telling the parties that the issues they raise are unworthy of legal recognition. To the contrary, we intend only to illustrate the limitations of the courts in fashioning a comprehensive solution to such a complex and socially significant issue.
[Nancy S. v. Michele G., 228 Cal.App.3d 831, 841, 279 Cal.Rptr. 212, 219 (Ct.App. 1991).]
See also West v. Superior Court, 59 Cal.App. 4th 302, 69 Cal.Rptr.2d 160 (1997) (denying custody and visitation); In re Custody of H.S.H.-K., 193 Wis. 2d 649, 533 N.W.2d 419 (denying custody), cert. denied, Knott v. Holtzman, 516 U.S. 975, 116 S.Ct. 475, 133 L.Ed.2d 404 (1995).
In New Jersey we have nevertheless recognized that
[w]hen social mores change, governing statutes must be interpreted to allow for those changes in a manner that does not frustrate the purposes behind their enactment. To deny the children of same-sex partners, as a class, the security of a legally recognized relationship with their second parent serves no legitimate state interest.
[Adoption of Two Children by H.N.R., 285 N.J.Super. 1, 10, 666 A.2d 535 (App. Div.1995), quoting Adoptions of B.L.V.B. and E.L.V.B., 160 Vt. 368, 628 A.2d 1271, 1275 (1993).]
Generally a third party who is seeking custody of a child not related to the third party biologically or by adoption must show that the natural or adoptive parent is unfit in order to be awarded custody. Zack v. Fiebert, 235 N.J.Super. 424, 432, 563 A.2d 58 (App.Div.1989); E.T. v. L.P., 185 N.J.Super. 77, 84, 447 A.2d 572 (App.Div.1982). Requiring that a third party show that the natural or adoptive parent is unfit protects *20 the natural or adoptive parent's right to the custody, care and nurturing of their children. Zack v. Fiebert, supra, 235 N.J.Super. at 432, 563 A.2d 58; Matter of D.T., 200 N.J.Super. 171, 175-76, 491 A.2d 7 (App.Div. 1985). See also Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982) (recognizing "[t]he fundamental liberty interest of natural parents"). In Zack Judge Long explained:
[t]here is no single standard applicable in every third party custody case; the standard to be applied depends upon the status of the third party vis a vis the natural parent and the child.
... Thus, normally, when a third party seeks custody as against a natural parent, the standard should be ... unfitness. ...
However, where, as a preliminary matter, the third party is able to show that he or she stands in the shoes of a parent to the child and thus in parity with the natural parent, he or she should be accorded the status of a natural parent in determining the standard to be applied to the quest for custody. In such circumstances, the best interests test should apply.
[Zack, supra, 235 N.J.Super. at 432, 563 A.2d 58 (citations omitted).]
This two-step approach works well for third party custody and visitation claims. It permits those individuals who do have a true parent-type relationship with a child to show that their continued role in the child's life would be in the best interests of the child.[5]
As Zack notes, "the standard to be applied depends on the status of the third party," and New Jersey courts have granted custody to third parties even when the legal or biological parent was not unfit.
In Hoy v. Willis, 165 N.J.Super. 265, 398 A.2d 109 (App.Div.1978), the foster mother had custody and functioned as a psychological parent to the child for approximately four years after a voluntary placement, and the expert testified as to the bonded relationship between the child and the foster mother. We therefore held that the best interests test should apply, and the order returning the child to his biological mother was vacated.[6] In Todd v. Sheridan, 268 N.J.Super. 387, 633 A.2d 1009 (App.Div.1993), we also applied a best interests test because the maternal grandparents, who sought custody after the mother's death, were the primary caretakers of the child, were bonded to her and, according to one expert, functioned as the child's psychological parents. We, therefore, reversed the Chancery Division's award of custody to the father. In Palermo v. Palermo, 164 N.J.Super. 492, 497, 397 A.2d 349 (App. Div.1978), where custody was awarded to the child's stepmother, the former wife of the natural father, we noted that New Jersey courts have not "hesitat[ed] to award custody to someone other than a natural parent when the best interests of the child so dictate, even in one case where the natural mother was no longer found to be unfit." See also S. v. H.M., 111 N.J.Super. 553, 270 A.2d 48 (App. Div.1970); S.M. v. S.J., 143 N.J.Super. 379, 363 A.2d 353 (Ch.Div.1976). We similarly conclude that "unfitness" is not the proper test here. Compare Matter of D.T., supra, 200 N.J.Super. at 171, 491 A.2d 7, applying an unfitness standard where the grandparents seeking custody did not allege that they were the child's psychological parents, the child had lived with them for less than one year, and the grandparents could not show why the father should be deprived of custody. See also E.T. v. L.P., supra, 185 N.J.Super. at 81-84, 447 A.2d 572.
N.J.S.A. 9:2-4 provides in pertinent part:
In making an award of custody, the court shall consider but not be limited to the following factors: the parents' ability to agree, communicate and cooperate in matters *21 relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children. A parent shall not be deemed unfit unless the parent['s] conduct has a substantial adverse effect on the child.
We cannot ignore the statute in applying the Zack test. Zack recognizes that a "psychological parent" is different than any other third party seeking custody and does not need to prove "unfitness" of the natural parent. Zack, supra, 235 N.J.Super. at 432-33, 563 A.2d 58. However, in applying the "best interests" test when a "psychological parent" seeks custody, deference must still be given to the statute's definition of parent and to the statutory policy. The statute refers to "parents," and the "natural bond of blood [as well as] affection," E.T. v. L.P., supra, 185 N.J.Super. at 84, 447 A.2d 572 (quoting In re Mrs. M., 74 N.J.Super. 178, 183, 181 A.2d 14 (App.Div.1962)), is a significant factor in deciding custody, cf. In the Matter of Baby M., 109 N.J. 396, 537 A.2d 1227 (1988). See also Matter of D.T., supra, 200 N.J.Super. at 175, 491 A.2d 7 (which recognized "the strong presumption in favor of the natural parent's right of custody of his or her own child").
Judge Wecker would remand for a new hearing on custody at which the parties would be guided by the "best interests" standard. I disagree. The record, including expert testimony, was fully developed before the trial judge announced the governing standard as he understood it. Neither party suggests she has anything further to offer and neither contends that a guardian ad litem or attorney for the children should have been appointed. See R. 5:8A, 5:8B.
The parties have been through a great deal as a result of this emotional litigation. They do not seek any more hearings on the issue of custody, and (without speculating on what this trial judge might do in light of his prior opinion)[7] I believe the record now warrants the determination that the "best interests" of the children require denial of the application for joint custody. Cf. Karins v. City of Atlantic City, 152 N.J. 532, 540-41, 706 A.2d 706 (1998); Bressman v. Gash, 131 N.J. 517, 528-29, 621 A.2d 476 (1993); R. 2:10-5.[8]
Given the fundamental differences between custody and visitation, the statutory definition of "parent" and the factors developed by our statute and case law regarding the issue of custody, we affirm the trial judge's denial of plaintiff's petition for joint legal custody.

IV.
New Jersey does not limit the privilege of visitation to natural or adoptive parents. The Legislature has, by statute, authorized the granting of visitation to others. See N.J.S.A. 9:2-7.1. Independently, visitation has been granted "under general principles of equity." Klipstein v. Zalewski, 230 N.J.Super. 567, 569, 553 A.2d 1384 (Ch.Div. 1988). In fact, before us defendant does not assert that visitation (or custody) can only be granted if there is statutory authorization therefor. See, e.g., D.T., supra, (granting visitation to grandparents (before statute authorizing it) even though natural father was given custody).
*22 In Custody of H.S.H-K., 193 Wis.2d 649, 533 N.W.2d 419, 421 (1995), a majority of the Wisconsin Supreme Court held that Wisconsin's visitation statute dealing with judgments relating to natural parents was not designed to "be the exclusive means of obtaining court-ordered visitation, or [to] supplant or preempt the court's long recognized equitable power to protect the best interest of a child by ordering visitation under circumstances not included in the statute." The majority concluded that visitation could be awarded "in a child's best interest if the petitioner first proves that he or she has a parent-like relationship with the child and that a significant triggering event justifies state intervention in the child's relationship with a biological or adoptive parent." 533 N.W.2d at 421. "To establish a significant triggering event justifying state intervention in the child's relationship with a biological or adoptive parent," the petitioner was required to "prove that this parent has interfered substantially with the petitioner's parent-like relationship with the child, and that the petitioner sought court ordered visitation, within a reasonable time after the parent's interference." It is undisputed that defendant has interfered with plaintiff's visitation with the children in this case and that V.C. sought judicial relief expeditiously.
The H.S.H.-K. majority articulated four factors which must be demonstrated to establish a true parent-type relationship, thereby entitling a third party to visitation:
To demonstrate the existence of the petitioner's parent-like relationship with the child, the petitioner must prove four elements: (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation [a petitioner's contribution to a child's support need not be monetary]; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.
[533 N.W.2d at 421 (one footnote omitted and one footnote placed in body).]
We apply the Wisconsin H.S.H.-K. test to evaluate whether visitation should be considered in the best interests of a child when there is no express statutory authorization. That is to say when a "parent-type relationship" exists and it is in the best interests of the child, visitation should be awarded. And in this context the issue of animosity between the parties should be evaluated as in any case involving visitation. Defendant cannot deprive plaintiff or the twins of visitation because of defendant's feelings towards plaintiff. Moreover, supervised visitation or some court-ordered exchange procedure can be developed where necessary.
Even under the trial judge's fact-finding and irrespective of whether defendant planned to have a child before meeting plaintiff, the record reflects that plaintiff was treated as a co-parent by defendant, at least for certain purposes; that plaintiff, defendant and the twins lived together as a family for about two years; that plaintiff acted as a parent towards the twins and that they bonded with her as a parent. There is no dispute that when the children were born defendant sent plaintiff a card "on the birth of our child" and stating that "[b]eing a family and being mothers together to our children means more to me than you may ever know." Thereafter, the parties and children participated in a "commitment ceremony," and plaintiff was listed as the "other mother" on the day care registration. Even defendant's expert thought plaintiff had become a psychological parent. Under these facts, therefore, plaintiff had a "parent-type relationship" with the children (H.S.H.-K.) and "stood in the shoes of a parent" (Zack) warranting visitation "in the best interests" of the children.
In looking at the best interests of the children, both experts found that they would benefit from continued contact with plaintiff. Both parties spent extensive time with the children from the time of their birth until the *23 separation. Plaintiff was actively involved in caring for the children and formed a bonded relationship with them. The children also bonded with her. Contrary to the trial judge's suggestion, even defendant's expert, Dr. Brodzinsky, testified that plaintiff "has been an important attachment figure" to the twins and answered "absolutely" when asked if it "would be fair to say that she is essentially a psychological parent to them." Subsequent to the separation, plaintiff continued to spend as much time with the children as defendant would allow. The parties' decision to separate and defendant's election to live with another woman cannot be a basis for depriving the children of continued visitation with plaintiff.

V.
We affirm the judgment denying the petition for joint custody. We reverse the judgment denying visitation and remand for further proceedings to establish a visitation schedule within thirty days.[9]
BRAITHWAITE, J.A.D., concurring in part and dissenting in part.
I agree with Judge Stern that plaintiff should be denied joint legal custody, but respectfully disagree with his reasons for that conclusion and therefore concur with that portion of the judgment. It therefore follows that, for the reasons expressed by Judge Stern, I disagree with Judge Wecker's opinion that this matter should be remanded for a new hearing on custody. I respectfully dissent from that part of the judgment awarding plaintiff visitation with defendant's children, without defendant's consent. Before I proceed any further, I wish to point out that my viewpoint is not influenced by the parties homosexual status. I would reach the same result, on this set of facts, if plaintiff was a male who had a relationship with defendant, but was not the parent of these children.
Applying New Jersey law, I see no basis for reversing the trial court's decision denying joint legal custody of these children to plaintiff. Plaintiff is not a parent, as defined by our statute. See N.J.S.A. 9:2-13(f). Instead, plaintiff is a third party who must prove that she is a psychological parent to these children in order to obtain custody. See Zack v. Fiebert, 235 N.J.Super. 424, 430-33, 563 A.2d 58 (App.Div.1989) (citing Hoy v. Willis, 165 N.J.Super. 265, 277, 398 A.2d 109 (App.Div.1978)).
A psychological parent is someone, other than a natural or adoptive parent, who, when removed from a child, will cause that child severe psychological harm. Hoy, supra, 165 N.J.Super. at 272, 398 A.2d 109. In Hoy a six year old boy had lived exclusively with his aunt, his foster parent, from the age of one and a half. The evidence established that the aunt was the child's psychological mother and that removing the child from her involved "more than a speculative possibility of harm to [the child]." Id. at 277, 398 A.2d 109. In denying custody to the boy's natural mother, we stated that "the possibility of serious psychological harm to the child may in a case such as this transcend all other considerations." Id. at 272, 398 A.2d 109 (citing Sorentino v. Family & Children's Society, 72 N.J. 127, 132, 367 A.2d 1168 (1976)).
Here, the trial court properly concluded that plaintiff was not a psychological parent. Although plaintiff and these children may have developed a strong loving relationship over a period of two years, the record does not support a conclusion that they will suffer severe psychological harm if plaintiff is not awarded joint legal custody. In that regard, both parties' experts testified that the children will experience some "short-term problems" if their relationship with plaintiff is terminated. As to long term effects, defendant's expert testified that "they will probably not suffer." He based this opinion on the fact that the children are "well cared for" and that well cared for children are resilient. He saw defendant's children "as reasonably resilient children." Plaintiff's expert said as to long term problems: "I don't feel anyone is able to predict." Thus, the only conclusion that this record supports is that the potential for serious psychological harm is, at best, a *24 "speculative possibility." Id. at 277, 398 A.2d 109. I think a great deal more than a "speculative possibility" has to be shown to award joint legal custody to plaintiff.
Moreover, Judge Wecker defines psychological parenthood as "a finding based upon the role the person historically has played in the child's life." With this definition, under the facts presented here, plaintiff would be a psychological parent if her relationship with defendant had ended within two months, or perhaps within even a shorter period of time, of the birth of defendant's children. Such a definition points out the uncertainty, because of the potential for litigation, that would befall children living within a relationship such as the one that existed previously between these parties. Judge Wecker's definition focuses incorrectly on the role of the parental figure to the child rather than on the relationship of the child to the parental figure. The proper focus is whether severe psychological harm to the child will result from removing the parental figure from the child. Hoy, supra, 165 N.J.Super. at 272, 398 A.2d 109. Severe psychological harm to the child must be demonstrated. As I have stated previously, that conclusion is not supported by this record. As such, there exists no basis to interfere with M.J.B.'s rights, as the natural parent of these children, and award joint legal custody to plaintiff.
Further, I am particularly concerned with my colleagues reliance on Adoption of Two Children by H.N.R., 285 N.J.Super. 1, 10, 666 A.2d 535 (App.Div.1995), to expand the statutory definition of "parent." There, the majority of a panel of this court construed the adoption statute to permit the natural mother's same sex partner to adopt the mother's children, with her consent, without terminating the natural mother's parental rights. See N.J.S.A. 9:3-50. The majority opinion "broadly construed" the step-parent exception of N.J.S.A. 9:3-50 to include the mother's same sex partner. Adoption of Two Children By H.N.R., 285 N.J.Super. at 8-9, 666 A.2d 535. In my view, evaluating changes in social mores and how those changes are to impact our social policy as reflected in our statutes, is more properly addressed by the Legislature as opposed to the courts.
It is not up to this court to either agree or disagree with the wisdom of the policy judgment this State has made in this regard. If there is to be any change in this regard, it should come from the legislative branch, rather from us.
[Adoption of Two Children by H.N.R., 285 N.J.Super. at 13, 666 A.2d 535 (Wefing, J.A.D., dissenting).]
Because plaintiff does not meet the definition of parent, I concur in the decision to deny plaintiff's application for joint legal custody.
I respectfully dissent from that part of the judgment awarding plaintiff visitation with defendant's children, without defendant's consent. I find no persuasive legal authority to justify granting visitation to plaintiff under these circumstances where the natural parent objects. As noted, supra, plaintiff is not a parent as defined by our statute. N.J.S.A. 9:2-13(f). Moreover, the fact that plaintiff is a parental figure to the children and has "bonded" with them is not a sufficient basis, in my view, to reach the result that the majority reaches here. These are very young children and as defendant's expert noted, "children form bonds with people such as grandparents, babysitters [and] nannies." The majority's holding, which applies the standards in Custody of H.S.H.-K., 193 Wis.2d 649, 533 N.W.2d 419, cert, denied, Knott v. Holtzman, 516 U.S. 975, 116 S.Ct. 475, 133 L.Ed.2d 404 (1995), would arguably permit former live-in grandparents, babysitters, nannies and others, visitation with the parent's children over the parent's objection. I cannot support such a view.
I am of the view that under these facts and circumstances the natural parent's decision not to consent to plaintiff's visitation ought to be upheld. I am not persuaded that any public policy leads to a different conclusion under the facts and circumstances here. In the absence of an express public policy to the contrary, a parent ought to have the right to decide who maintains a relationship with her children and what is in their best interest. These children are very young. This view recognizes the right of the natural parent, yet still adheres to what is in the best interests *25 of the child. The rights of the natural parent have long been recognized and are a firmly rooted part of our jurisprudence in this area:
The right of natural parents to the custody of their minor children is one of the basic rights incident to parenthood." This right, which recognizes the natural bond of blood and affection between parent and child, is unlike a property right. It has been described as akin to a trust reposed in the parent by the State as parens patriae, for the welfare of the infant." In re Mrs. M., 74 N.J.Super. 178, 183-84, 181 A.2d 14 (App.Div.1962). Indeed the right of natural parents to the custody, care and nurturing of their children has risen to the stature of a fundamental right and deserves special protection. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982).
[Zack, supra, 235 N.J.Super. at 431, 563 A.2d 58 (citing Matter of D.T., 200 N.J.Super. 171, 175-76, 491 A.2d 7 (App. Div.1985)) (other citations omitted).]
Further, I am persuaded, as was the trial court, that the animosity between plaintiff and defendant warranted the termination of plaintiff's relationship to defendant's children. N.J.S.A. 9:2-7.1[10] sets forth factors that the court shall consider in ordering visitation for grandparents and siblings, including: "the relationship between each of the child's parents ... and the applicant." N.J.S.A. 9:2-7.1b(2). The purpose of this factor is "that it is not in the best interest of the child to force the child into the midst of a conflict between the parents and the grandparents." Thompson v. Vanaman, 212 N.J.Super. 596, 598, 515 A.2d 1254 (App.Div. 1986) (citing Mimkon v. Ford, 66 N.J. 426, 430, 332 A.2d 199 (1975)).
One could argue that when natural parents experience animosity toward each other, courts do not terminate the non-custodial parent's right to visitation and therefore we should not do so in this circumstance. The difference here, however, is expressed in the public policy of our State that affords visitation rights to parents. See N.J.S.A. 9:2-4. I am not persuaded that any similar public policy, as expressed by our Legislature or case law, exists for the circumstances presented here. In my view it would be up to our State Legislature to address the factual circumstance presented by this appeal.
I note further that N.J.S.A. 9:2-7.1 is contrary to the common law as it pertains to the rights of grandparents and siblings to visitation. Mimkon v. Ford, supra, 66 N.J. at 431, 332 A.2d 199. If a statute is needed to grant visitation to grandparents and siblings, then I think similar statutory authority has to exist to support the position that plaintiff asserts here. In addition, the law cited by the majority to support visitation by plaintiff is not persuasive. The facts and circumstances of those cases are not easily applied here by way of analogy.
Finally, in Nancy S. v. Michele G., 228 Cal.App.3d 831, 279 Cal.Rptr. 212 (Ct.App. 1991), the California Court of Appeals, in denying a woman visitation with the children of her former partner, said:
[E]xpanding the definition of a "parent" in the manner advocated by the appellant could expose other natural parents to litigation brought by child-care providers of long standing, relatives, successive sets of stepparents or other close friends of the family. No matter how narrowly we might attempt to draft the definition, the fact remains that the status of individuals claiming to be parents would have to be litigated and resolution of these claims would turn on elusive factual determinations of the intent of the natural mother, the perceptions of the children, and the course of conduct of the party claiming parental status. By deferring to the Legislature in matters involving complex social and policy ramifications far beyond the facts of the particular case, we are not telling the parties that the issues they raise are unworthy of legal recognition. To the contrary, we intend only to illustrate the limitations of the courts in fashioning *26 a comprehensive solution to such a complex and socially significant issue.
[Id. at 841, 279 Cal.Rptr. at 219.]
I think this language is compelling. Applying the factors set forth by the Wisconsin Supreme Court, as the majority does here, undermines the rights of all natural and adoptive parents and leads to more litigation concerning the rights of individuals claiming to be parents. This is an issue for our Legislature and not our courts.
I would therefore affirm the decision of the trial court.
WECKER, J.A.D., concurring in part; dissenting in part.
I concur in the opinion of Judge Stern with respect to visitation. I agree completely with Judge Stern that "the critical issue to be decided is whether the granting of joint custody or visitation is in the `best interests' of the children." However, I dissent from the decision reached by Judges Stern and Braithwaite, albeit on entirely different grounds, to affirm the denial of joint legal custody.
My disagreement with Judge Stern in regard to the custody issue in this case is narrow. He would affirm the denial of joint custody, apparently applying the best interests standard to the trial record, and citing only the biological relationship of M.J.B. with the children as the basis for affirming rejection of joint custody. I agree that the biological relationship is a factor to be considered in making a custody determination, particularly if each party seeks sole custody. However, biology warrants considerably less weight when joint custody is sought by one who is, as Judge Stern and I agree, the other psychological parent to the children. The controlling best interest standard has never been applied to the facts in this case, because the trial judge concluded, contrary to the overwhelming weight of the evidence, that V.C. was not a psychological parent. The judge therefore obviously did not consider custody or visitation under a best interests analysis.
Based on the record and the undisputed facts, it is plain to me, as it is to Judge Stern, that visitation with V.C. is in the best interests of the children. A remand is required to determine a specific visitation plan. By contrast, I cannot find on this record that joint custody is or is not in the best interests of these children. That is a decision best left to the Family Part in the first instance. I therefore would remand the matter for reconsideration of custody under a best interest analysis. While I recognize the downside of postponing finality, I am confident that it can be accomplished quickly if given priority, and that it is a critical step in determining the future relationship between these children and their "other mother."
In order to consider whether the trial court erred in terminating the relationship between V.C. and the children, that is, whether visitation or joint custody was improperly denied, we first must decide what standard applies. In reaching the decision that the best interests of the child must drive both visitation and custody disputes between a biological parent and another bonded, psychological parent, I begin, as do my colleagues, by examining the relevant statutes. N.J.S.A. 9:2-3 provides:
[w]hen the parents of a minor child live separately, or are about to do so, the Superior Court, in an action brought by either parent, shall have the same power to make judgments or orders concerning care, custody, education and maintenance as concerning a child whose parents are divorced.... (emphasis added.)
N.J.S.A. 9:2-4 further provides, in part, that:
[t]he Legislature finds and declares that it is in the public policy of this State to assure minor children of frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and that it is in the public interest to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy.
In any proceeding involving the custody of a minor child, the rights of both parents shall be equal....(emphasis added.)
I find the statutory definition of "parent" set forth in N.J.S.A. 9:2-13(f) to be significant: "The word `parent,' when not otherwise described by the context, means a natural parent *27 or parent by previous adoption." N.J.S.A. 9:2-13(f) (emphasis added). The Legislature did not foreclose the possibility that a person other than a "natural parent or parent by previous adoption" might come within the class of persons referred to as "parents" in N.J.S.A. 9:2-3 and 9:2-4, depending upon "the context." That definition evidences flexibility, not rigidity, consistent with the various family relationships existing in our society today. More significantly, it is consistent with the family established by these parties, who entered into what each described as a committed relationship, unquestionably intending to raise these children together. I can imagine few circumstances in which a person other than a "natural parent or parent by previous adoption" is better "described by the context" than V.C.
The facts here plainly evidence defendant's recognition of plaintiff as the children's "other mother," at least during the first two-and-one-half years of the children's lives. The parties' commitment ceremony was as close to a marriage ceremony as it could be under law. It was sanctioned by a priest who was recognized by both parties. M.J.B. chose V.C. to be the children's "other mother," and expressed her feelings about V.C.'s role as a co-parent on numerous occasions. The parties and the children attended numerous family and social events together as a family, including functions at Lambda Families, an organization for gay and lesbian families. In addition, the children had a close relationship with V.C.'s extended family. V.C's brother is J.M.B.'s godfather; the children called V.C.'s mother "grandma," and they are also close to V.C.'s grandmother and siblings.
The trial judge erred, in my view, by posing the wrong question with respect to M.J.B.'s intent in conceiving these children. He cited M.J.B.'s medical consultation and preparation for artificial insemination before entering a relationship with V.C., and her discussions with others about the choice of a sperm donor, in support of his conclusion that "[t]he decision to have the children was clearly the defendant's rather than a joint decision by both parties." The relevant question, it seems to me, is not whether M.J.B. would have gone forward with insemination without V.C., but whether she in fact did so fully intending that they would jointly parent the child[ren] of this conception. The record unambiguously establishes that the answer to that question is "yes."
From the point of view of the children and the parties, V.C. is no third party interloper. Even measured by the trial judge's recitation of the facts, plaintiff's relationship with the children was functionally and psychologically that of a parent.
Moreover, the evidence was undisputed that V.C. undertook the financial responsibilities of a parent to these children. While the parties maintained their relationship, each executed a will naming the other as beneficiary, and each named the children as contingent beneficiaries. V.C. originally named the children as contingent beneficiaries on her pension and life insurance, with M.J.B. as primary beneficiary. After the parties separated, V.C. made the children her primary beneficiaries. The parties contributed to savings accounts for each child, and each of the parties served as a custodian. In addition, V.C. voluntarily paid child support to M.J.B. after the separation, which M.J.B. accepted for a time, apparently until she decided to cut off V.C.'s relationship with the children. By denying the non-biological mother any legal recognition, the court has also denied the children the financial support of a second parent, as well as the security of having another parent who could maintain stability and continuity in their lives in the event of M.J.B.'s premature death or incapacity.
I disagree with Judge Braithwaite's reliance upon what he describes as a literal interpretation of the statute defining "parent," and his view that allowing either visitation or custody as sought here by V.C. would constitute a radical departure from current law. Without disavowing Zack, Judge Braithwaite justifies the denial of both custody and visitation on a finding that "the trial court properly concluded that plaintiff was not a psychological parent." He reaches that conclusion by defining "psychological parent" as one whose removal from the child's life "will cause that child severe psychological harm," citing Hoy v. Willis, 165 *28 N.J.Super. 265, 272, 398 A.2d 109 (App.Div. 1978), without addressing the evidence that Judge Stern and I each have cited to conclude that V.C. is a psychological parent. Psychological parenthood is a finding based upon the role the person historically has played in the child's life. Neither optimistic nor pessimistic predictions of future harm that would result from ending that role can logically define the role itself.
Judge Braithwaite would recognize no legal status whatsoever in V.C.'s relationship to the children absent express legislation. In my view, granting V.C. visitation and remanding for reconsideration of custody would effect a reasonable application of existing statutes and common law to reality; families today take many forms, and we must protect all relationships between parents and children.
While it would be appropriate for the Legislature to address the issues raised by this case, these children cannot wait. It is the function of the courts to address those interstitial areas where no statute literally controls. See, e.g., In re Adoption of B. by E. and R., 152 N.J.Super. 546, 555, 378 A.2d 90 (Co.Ct.1977) (in light of the birth father's objection, Judge (now Justice) Coleman denied adoption but awarded custody to grandparents who "[stood] as psychological parents to B. in every sense of the term.)" My opinion is informed, as is Judge Stern's, by the decision and reasoning of the majority in Adoption of Two Children by H.N.R., 285 N.J.Super. 1, 10, 666 A.2d 535 (App.Div. 1995), quoting Adoptions of B.L.V.B. and E.L.V.B., 160 Vt. 368, 628 A.2d 1271, 1275 (1993),[11] and construing the adoption statute to permit a biological mother's same sex partner to adopt.
When social mores change, governing statutes must be interpreted to allow for those changes in a manner that does not frustrate the purposes behind their enactment. To deny the children of same-sex partners, as a class, the security of a legally recognized relationship with their second parent serves no legitimate state interest.
My view is consistent, as is Judge Stern's, with Zack v. Fiebert, 235 N.J.Super. 424, 432, 563 A.2d 58 (App.Div.1989), where Judge Long wrote for this court:
[T]here is no single standard applicable in every third party custody case; the standard to be applied depends upon the status of the third party vis a vis the natural parent and the child.

....
[W]here, as a preliminary matter, the third party is able to show that he or she stands in the shoes of a parent to the child and thus in parity with the natural parent, he or she should be accorded the status of a natural parent in determining the standard to be applied to the quest for custody. In such circumstances, the best interests test should apply.
[(emphasis added) (citations omitted).]
See also J.A.L. v. E.P.H., 453 Pa.Super. 78, 682 A.2d 1314, 1319 (1996):
Biological parents have a prima facie right to custody, but biological parenthood is not the only source of such a right. Cognizable rights to seek full or partial custody may also arise under statutes ... permitting grandparents and great-grandparents to seek visitation or partial custody of their grandchildren or great grandchildren or by virtue of the parties' conduct, as in cases where a third party who has stood in loco parentis has been recognized as possessing a prima facie right sufficient to grant standing to litigate questions of custody of the child for whom he or she has cared. See, e.g., Rosado v. Diaz, 425 Pa.Super. 155, 624 A.2d 193 (1993); Karner v. McMahon, 433 Pa.Super. 290, 640 A.2d 926 (1994).
In Zack we recognized that someone who stands in the shoes of a parent, that is, *29 one who has effectively become a psychological parent, is different than any other third party seeking custody, and that such a parent therefore need not prove that the so-called natural parent is unfit. Zack, supra, 235 N.J.Super. at 432-33, 563 A.2d 58. However, the record contained insufficient proof that the grandparents who sought custody had become psychological parents to the child, and "the standard to be applied depends on the status of the third party...." The best interest test was therefore inappropriate.
One commentator has recommended "expanding the definition of parent to include those persons who have established a parental relationship with the child," while preserving "the natural parent preference, but only to the extent that it is consistent with the child's best interest." Janet Leach Richards, The Natural Parent Preference Versus Third Parties: Expanding the Definition of Parent, 16 Nova L.Rev. 733, 735 (1992). Richards would extend the natural parent preference to a third party who had acted as a parent, such as V.C., and in a custody dispute between such a person and a natural parent, as here, the standard simply "would be the best interest of the child." Id.
As Judge Stern notes, there is ample precedent for granting custody to a psychological parent where that is in the best interest of the child. See Hoy v. Willis, 165 N.J.Super. 265, 398 A.2d 109 (App.Div.1978) (foster mother functioned as a psychological parent and had a bonded relationship with the child). In Hoy we recognized more than twenty years ago,
Courts have traditionally been reluctant to deny a parent custody of his or her child. However, when the best interests of the child will clearly be served by a custody award to a third party, a finding of either parental unfitness or abandonment is not a prerequisite to the entry of an order doing so.

....
That there can be a psychological parent-child relationship between a child and someone other than the child's biological parent is well recognized in the literature on the subject. Biological relationships are not an exclusive determinate of the existence of a family.
[Id. 165 N.J.Super. at 272, 398 A.2d 109. (citations omitted).]
See also Todd v. Sheridan, 268 N.J.Super. 387, 633 A.2d 1009 (App.Div.1993) (reversing custody award to father, and ordering a best interests test to consider maternal grandparents' custody claim as the child's psychological parents and primary caretakers). Palermo v. Palermo, 164 N.J.Super. 492, 497, 397 A.2d 349 (App.Div.1978) (custody awarded to child's stepmother over the natural father); S.M. v. S.J., 143 N.J.Super. 379, 363 A.2d 353 (Ch.Div.1976). I agree entirely with Judge Stern that "unfitness" is not the proper test here. In applying the best interest test to a psychological parent's application for custody, I would follow the guidance of N.J.S.A. 9:2-4, considering the non-exclusive factors set forth in that statute, and recognizing the "status as biological [parent] as one weight in the best interests balance." Todd v. Sheridan, supra, 268 N.J.Super. at 399, 633 A.2d 1009.
Judge Braithwaite relies in part upon a decision of one intermediate appellate court in California. Nancy S. v. Michele G., 228 Cal.App.3d 831, 279 Cal.Rptr. 212 (1991) (denying custody and visitation on similar facts). After describing the parties' joint decision to parent two children, and the post-separation shared custody arrangements, that court "agree[d] with appellant that the absence of any legal formalization of her relationship to the children [i.e., adoption] has resulted in a tragic situation." Id., 228 Cal.App.3d at 841, 279 Cal.Rptr. at 219 (emphasis added). However, the California court felt bound to a narrow statutory definition of parent "as one who is the natural or adoptive parent of a child." Id., 228 Cal.App.3d at 835, 279 Cal.Rptr. at 215.[12]
[E]xpanding the definition of a `parent' in the manner advocated by the appellant *30 could expose other natural parents to litigation brought by child-care providers of long standing, relatives, successive sets of stepparents or other close friends of the family. No matter how narrowly we might attempt to draft the definition, the fact remains that the status of individuals claiming to be parents would have to be litigated and resolution of these claims would turn on elusive factual determinations of the intent of the natural mother, the perceptions of the children, and the course of conduct of the party claiming parental status. By deferring to the Legislature in matters involving complex social and policy ramifications far beyond the facts of the particular case, we are not telling the parties that the issues they raise are unworthy of legal recognition. To the contrary, we intend only to illustrate the limitations of the courts in fashioning a comprehensive solution to such a complex and socially significant issue.
[Id. 228 Cal.App.3d at 841, 279 Cal.Rptr. at 219.]
Our own statute is broader, as noted above, and in any event does not require judicial inaction in the face of a perceived "tragic situation." I do not share the fear of a "slippery slope" as expressed by the California court and Judge Braithwaite. Family courts make decisions that "turn on elusive factual determinations" of intent and perceptions every day. Moreover, concern that to allow V.C. visitation will subject other parents to intrusive applications for visitation by "former live-in grandparents, babysitters, nannies and others" represents an understandable but unwarranted fear. Writing for a Pennsylvania appellate court, Judge Beck has said it well:
The in loco parentis basis for standing recognizes that the need to guard the family from intrusions by third parties and to protect the rights of the natural parent must be tempered by the paramount need to protect the child's best interest. Thus, while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, that presumption must give way where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. Where such a relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objections.
[J.A.L. v. E.P.H., supra, 682 A.2d at 1319-20.]
Parental autonomy over child-rearing is a significant value that has long been recognized by society and the courts. See, e.g., John DeWitt Gregory, Blood Ties: A Rationale for Child Visitation by Legal Strangers, 55 Wash. & Lee L.Rev. 351, 382-402 (1998) (criticizing the best interests test, even in the limited context of visitation); Mark Strasser, Legislative Presumptions and Judicial Assumptions: On Parenting, Adoption, and the Best Interest of the Child, 45 U. Kan. L.Rev. 49, 50 (1996). The apparent tension between parental autonomy and so-called third-party claims to custody and visitation does not justify ignoring the bonds a child forms with a psychological parent. I am convinced that we can serve the interests of children in non-traditional families such as this, while nevertheless protecting legitimate parental concerns for autonomy. See e.g., Nancy D. Polikoff, This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian-Mother and Other Nontraditional Families, 78 Geo. L.J. 459, 464, 490, 501-07, 513-16, 574-75 (1990).
Suffice it to say that the facts apparent in the record before us, with respect to this plaintiff's relationship with these children, could not be established by the average babysitter, nanny, or grandparent (including even most "live-in" grandparents). Those few persons who can prove a relationship similar to that of V.C. with these children should be properly recognized. Indeed, our ability to distinguish between those who truly stand in the shoes of a parent and others who play significant but not parental roles in a *31 child's life, is best evidenced by this court's decision in Zack. While recognizing the best interest standard for adjudicating custody and visitation disputes involving persons who stand in loco parentis, the court in Zack concluded that the evidence concerning those grandparents' close relationship with the children nevertheless did not place them in the shoes of a parent.
This is not the first time a court has had to address these difficult issues. See Nicole Berner, Child Custody Disputes Between Lesbians: Legal Strategies and Their Limitations, 10 Berkeley Women's L.J. 31, 32 (1995) (citing an American Bar Association estimate that between six and ten million children in the United States are being raised by gay or lesbian parents.) And certainly it is not the last. As our society and cultures evolve, along with our concepts of family, courts will undoubtedly face other situations in which the parties to a non-traditional parenting arrangement, each of whom is directly involved with the care and nurturing of a child, come to a parting of the ways and fail to agree on the best means of parenting. Such failures will continue to bring courts into the picture, allowing and requiring true strangers to determine what is in the best interest of the child.
The availability of artificial insemination (including known, unknown, and combined sperm donors), in vitro fertilization (including egg donation), and other means of reproduction, may further cloud the definition of biological parenthood. See Craig W. Christensen, If Not Marriage? On Securing Gay and Lesbian Family Values By A "Simulacrum of Marriage," 66 Fordham L.Rev. 1699, 1760-62 (1998). Indeed, psychological parenting takes on more and more importance under these circumstances. Would we view this case differently if V.C. had donated the eggs for in vitro fertilization, and the fertilized embryo had been implanted in M.J.B.'s uterus? What if two men, intending to jointly parent their child, each donated sperm to be mixed together and used to artificially inseminate a woman willing to carry the child for them? And then there are the rare switched-baby cases. Bright-line rules that are appropriate to financial and commercial disputes are less helpful in resolving such relationship issues. See, e.g., Strasser, supra, 45 U. Kan. L.Rev. at 109-10.[13] In the matter before us, I can find no better guiding principle than the best interest of the child.
Others have adopted that principle, at least in the context of visitation disputes. In Holtzman v. Knott, 193 Wis. 2d 649, 533 N.W.2d 419, 421, cert. denied, 516 U.S. 975, 116 S.Ct. 475, 133 L.Ed.2d 404 (1995), discussed at length by Judge Stern, the Wisconsin Supreme Court set forth a workable standard for addressing visitation disputes after the break-up of a relationship between the adults. That Court affirmed without discussion the trial court's order dismissing the plaintiff's petition for custody, on the basis of the Wisconsin custody statute, holding that the plaintiff had "not raised a triable issue regarding [defendant's] fitness or ability to parent her child and has not shown compelling circumstances requiring a change of custody." Id. 533 N.W.2d at 420, citing Wis. Stat. § 767.24(3). The majority adopted a more liberal standard for visitation. Concurring in Holtzman, Justice Bablitch eloquently addressed the same concerns I have here:
My focus is on the completely innocent victim in this case, and the thousands of others like him: the children of dissolving non-traditional relationships. The issue is the best interests of these children, and the role of the court in protecting them.
The dissents totally ignore the access (i.e. visitation) interests of the one undisputable victim in this case, the child. Having been victimized by the dissolving relationship of the two people who raised him, the dissents would victimize the child once more by denying him any relationship with one of the two people he has come to love and cherish. It is through no fault of this child that he finds himself where he is today. Yet the dissents, two of which accuse the majority of legislating a result, *32 themselves legislate the courts right out of any role in protecting access rights for children of dissolving non-traditional families.

[533 N.W. 2d at 437-38.]
In a visitation dispute between lesbian parents with a history remarkably similar to the case before us, but where custody was not sought, Judge (now Chief Judge) Kaye of the New York Court of Appeals dissented from "[t]he Court's decision, fixing biology as the key to visitation rights...." In re Alison D. v. Virginia M., 77 N.Y.2d 651, 657-58, 572 N.E.2d 27, 30, 569 N.Y.S. 2d 586, 589 (1991):
[T]he impact of today's decision falls hardest on the children of those relationships, limiting their opportunity to maintain bonds that may be crucial to their development. The majority's retreat from the courts' proper roleits tightening of rules that should in visitation petitions, above all, retain the capacity to take the children's interests into accountcompels this dissent.
The reasoning of Justice Bablitch and Judge Kaye applies equally to custody disputes where a psychological parent is involved.
I am satisfied that the record of V.C.'s relationship with the children requires visitation, whereas that relationship does not necessarily point to joint custody. In regard to custody, I would hold simply that where a person proves a bonded parental relationship with a child,[14] a best interest analysis must form the basis for a custody determination. That has not happened in this case.
I would therefore reverse the judgment denying joint custody and visitation, and barring V.C. from all contact with the children. I would remand to the Family Part not only to establish a visitation plan, but also to determine V.C.'s application for joint custody under a best interests analysis. I would instruct the Presiding Judge of the Family Part to assign another judge to the matter on remand, in order to insure a fresh evaluation under the correct legal standard. I would instruct the judge on remand to begin with the existing record, and leave to the judge's discretion how much additional lay or expert testimony would be helpful to the court, and whether to appoint a guardian ad litem or attorney to represent the interests of the children with respect to custody, as permitted by N.J.S.A. 9:2-4c "for good cause and upon [the court's] own motion...."
Because I am concerned that V.C. has been barred from all contact with the children since the Family Part's decision in June 1998, I would direct the designated Family Part Judge to establish a visitation schedule within thirty days, to conclude the custody hearings within 90 days, and to give this entire matter the highest possible priority. Time does not stand still for children while the parties and the courts pursue litigation.
NOTES
[1] There were some significant differences and some essential agreement in the testimony of the parties as to the role of V.C. in the various decisions regarding the children and their care.
[2] M.J.B. alleges that there is animosity between the parties, and refers to an incident which occurred during the court ordered visitation. Defendant has moved to supplement the record by reference to that event and others. We now deny the motion since the parties will have an opportunity to address the subject on remand.
[3] The judge wrote "although the plaintiff maintains she harbors no grudges or animosity for the defendant, the same cannot be said for the defendant towards the plaintiff."
[4] For this reason we do not have to address the judge's conclusion that an in loco parentis relationship "terminate[s] once the relationship between the adults is ended." Compare Palermo v. Palermo, 164 N.J.Super. 492, 397 A.2d 349 (App. Div.1978).
[5] The parties both contend that their homosexual status should not affect the test and that this case should be decided as if plaintiff were an unmarried male lover who had a relationship with defendant. However, the parties can find no New Jersey case which deals with the issues involving those circumstances. But see Klipstein v. Zalewski, 230 N.J.Super. 567, 553 A.2d 1384 (Ch.Div.1988) (regarding visitation). See also, e.g., Van v. Zahorik, 227 Mich.App. 90, 575 N.W.2d 566 (1997), appeal granted, 458 Mich. 865, 582 N.W.2d 836 (1998).
[6] The foster mother was a paternal aunt who was given custody after the Division of Youth and Family Services obtained "temporary custody" pursuant to N.J.S.A. 30:4C-12.
[7] I see no reason to remove this judge from the case.
[8] I recognize that our scope of review would be limited if credibility issues were involved and the trial judge made the initial determination of best interests. Rova Farms Resort Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974); Matter of D.T., supra, 200 N.J.Super. at 175, 491 A.2d 7.
[9] There are various issues which must be addressed on the remand including Dr. Brodzinsky's concern about plaintiff's relations with a person named "Chris."
[10] This statute permits grandparents and siblings to make application before the Superior Court for visitation.
[11] I note, however, that the Supreme Court of Vermont later declined on facts similar to those before us to exercise its equitable jurisdiction to order visitation, finding neither statutory nor common law grounds for jurisdiction. Titchenal v. Dexter, 166 Vt. 373, 693 A.2d 682 (1997) (citing a recently enacted Vermont statute providing for adoption by the same-sex partner of a biological parent, and establishing jurisdiction to decide custody or visitation disputes when the adults' relationship breaks up. Id. 693 A.2d at 687.)
[12] For a detailed discussion of the issues raised by the California case, see Elizabeth A. Delaney, Statutory Protection of the Other Mother: Legally Recognizing the Relationship Between the Nonbiological Lesbian Parent and Her Child, 43 Hastings L.J. 177 (1991).
[13] There is, in my view, a pressing need for professionals in many disciplines, including law, child psychology, and medical ethics, to consider these circumstances, and for the legislature to consider the informed views of such persons whenever it addresses custody and visitation of children.
[14] The terms variously employed by courts and commentators include psychological parent, in loco parentis, de facto parenthood, equitable parent or functional parent, among others.